```
1    STATE OF ILLINOIS        )
     COUNTY OF LAKE           )
2
                    IN THE CIRCUIT COURT
3             OF THE 19TH JUDICIAL CIRCUIT
                  LAKE COUNTY, ILLINOIS
4                       - - -
5    BUSINESS PRO                  :
     COMMUNICATIONS, INC.,         :
6    And ILLINOIS CORPORATION,    :
     Individually and as the      :
7    representative of a class :
     of similarly-situated        :
8    persons,                      :
               Plaintiffs,        :
9                                  :
          vs.                      :
10                                 :
     EXPRESS PRODUCTS,             :
11         Defendant      : No. 04L1043
12                      - - -
            Friday, January 19, 2007
13                      - - -
14             Oral deposition of DAN GEIGER,
15   taken pursuant to notice, at the law offices
16   of HERMAN WEINBERG, ESQ., 1900 Market Street,
17   4th Floor, Philadelphia, Pennsylvania,
18   beginning at 9:15 a.m., before Erica Crager
19   Hearn, Court Reporter and Notary Public in the
20   Commonwealth of Pennsylvania.
21                      - - -
             ESQUIRE DEPOSITION SERVICES
22                Four Penn Center
            1600 John F. Kennedy Boulevard
23                   Suite 1210
            Philadelphia, Pennsylvania  19103
24                (215) 988-9191
```

**Page 2**

```
1  APPEARANCES:
2      ANDERSON & WANCA
       BY: RYAN KELLY, ESQ.
3      3701 Algonquin Road
       Suite 760
4      Rolling Meadows, IL  60008
       (847) 368-1500
5      rkelly@andersonwanca.com
       Representing the Plaintiffs
6
       LABARGE, CAMPBELL & LYON, LLC
7      BY: NATALIE M. MESPLOU, ESQ.
       200 West Jackson Boulevard
8      Suite 2050
       Chicago, IL  60606
9      (312) 580-9010
       nmesplou@lcllaw.com
10     Representing the Defendant
11         - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1           - - -
       DEPOSITION SUPPORT INDEX
2           - - -
3
   Direction to Witness Not to Answer
4  Page Line   Page Line   Page Line
   None
5
6
7  Request for Production of Documents
   Page Line   Page Line   Page Line
8  104  10
9
10 Stipulations
   Page Line   Page Line   Page Line
11 5  1
12
13 Question Marked
   Page Line   Page Line   Page Line
14 None
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1           - - -
          I N D E X
2           - - -
3  Testimony of:  DAN GEIGER
4      By Mr. Kelly        5
       By Ms. Mesplou    106
5      By Mr. Kelly      122
6           - - -
       E X H I B I T S
7           - - -
8  NO.    DESCRIPTION        PAGE
9  Exhibit-9  List from Mail2Media  100
   (Retained by counsel).
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
1       (It is hereby stipulated by
2  and between counsel that sealing,
3  filing and certification are
4  waived).
5           - - -
6       DAN GEIGER, having been duly
7  sworn, was examined and testified
8  as follows:
9           - - -
10       EXAMINATION
11           - - -
12 BY MR. KELLY:
13     Q.  State your name, please.
14     A.  Dan Geiger.
15     Q.  Spell your last name,
16 please?
17     A.  G-E-I-G-E-R.
18     Q.  Let the record reflect that
19 this is the discovery deposition of Mr. Geiger
20 taken pursuant to the Illinois Supreme Court
21 Rules and all local applicable Rules.
22     Mr. Geiger, there is a court reporter
23 here.  She is going to take down what
24 everybody says here today in this room;
```

DAN GEIGER

**6**

1  therefore, it is important for you to keep
2  your answers out loud.  You can't shrug your
3  shoulders, can't nod your head, or do anything
4  like that because the court reporter can't
5  take down those types of gestures.  I am going
6  to be asking the majority of the questions
7  here today.  Please, allow me to finish asking
8  the question before giving an answer to it so
9  the court reporter can take down a more
10  accurate record, okay?
11      **A.   Okay.**
12      Q.   If you don't understand a
13  question of mine, ask me to rephrase.  I don't
14  want you to give an answer to a question that
15  you don't understand.  Okay?
16      **A.   Okay.**
17      Q.   If you do give an answer to
18  a question that I do ask, I am going to assume
19  that you understood the question; is that
20  fair?
21      **A.   Yes.**
22      Q.   If you need to take a break,
23  talk to your attorney, just let me know and we
24  can do that.  Okay?

**7**

1      **A.   Yes.**
2      Q.   Are you currently employed?
3      **A.   Yes.**
4      Q.   Where?
5      **A.   18 Cassell Road, Souderton,**
6  **Pennsylvania.**
7      Q.   Which company?
8      **A.   Express Products.**
9      Q.   Are you an owner of Express
10  Products?
11      **A.   Yes.**
12      Q.   Are there any other owners
13  of Express Products?
14      **A.   No.**
15      Q.   What is your job title,
16  president?
17      **A.   What do you mean title?**
18      Q.   Well, what is your job
19  title?  Are you the president of Express
20  Products?
21      **A.   Yes.**
22      Q.   How long has Express
23  Products been in business?
24      **A.   Since 1998 -- sorry 1996.**

**8**

1      Q.   You mean 1996?
2      **A.   Yes.**
3      Q.   Prior to 1996, did you have
4  experience in the cell phone accessory
5  business?
6      **A.   Yes.**
7      Q.   When was the first time you
8  were involved in the cell phone accessory
9  business?
10      **A.   1996.**
11      Q.   How were you involved?
12      **A.   Through a different --**
13  **another company.**
14      Q.   What is the company's name?
15      **A.   Express Cellular Products.**
16      Q.   Were you the owner?
17      **A.   Partner.**
18      Q.   Is Express Cellular Products
19  out of business?
20      **A.   Yes.**
21      Q.   Who is your partner?
22      **A.   David Mausof.**
23      Q.   Can you spell his last name?
24      **A.   M-A-U-S-O-F**

**9**

1      Q.   Where did Express Cellular
2  Products operate out of?
3      **A.   Forty Foot Road, Kulpsville,**
4  **Pennsylvania.**
5      Q.   Did Mr. Mausof express
6  interest in the cell phone accessory business?
7      **A.   Yes.**
8      Q.   Did he bring you on as a
9  partner to form Express Cellular Products?
10      **A.   Yes.**
11      Q.   Is Mr. Mausof associated
12  with Express Products?
13      **A.   No.**
14      Q.   What happened to Express
15  Cellular Products, it went out of business?
16      **A.   Yes.**
17      Q.   Did you then form a new
18  company?
19      **A.   Yes.**
20      Q.   When you formed Express
21  Products, did you operate out of 18 Cassell
22  Road?
23      **A.   Yes.**
24      Q.   So, Express Products has

DAN GEIGER

10

1  always operated out of 18 Cassell Road?
2      A.  Yes.
3      Q.  What does Express Products
4  do?
5      **A.  Distribute and wholesale**
6  **accessories for cellular phones.**
7      Q.  Distribute and wholesale,
8  and then?
9      **A.  Accessories for cellular**
10  **phones.**
11      Q.  Has the business of Express
12  Products always been the distribution and
13  wholesale of accessories for cellular phones?
14      **A.  Yes.**
15      Q.  In 2003, how many employees
16  did Express Products have, approximately?
17      **A.  Approximately, 12.**
18      Q.  Can you identify who the
19  employees were to the best of your ability in
20  2003?
21      **A.  What do you mean identify?**
22      MS. MESPLOU:  Their names.
23      THE WITNESS:  Now?
24      MR. KELLY:  No, in 2003.

11

1      Now I want you give me the names
2  of the employees of 2003.
3      THE WITNESS:  Some of them,
4  not all of them.
5  BY MR. KELLY:
6      Q.  Okay.  To the best of your
7  ability, can you give me their names?
8      **A.  Yes.**
9      Q.  Go ahead.
10      **A.  Sandy Wolf.**
11      Q.  How do you spell the last
12  name?
13      **A.  Same as animal.**
14      Q.  Okay.
15      **A.  Tony Isabella,**
16  **I-S-A-B-E-L-L-A.  Tim Ellis, E-L-L-I-S.**
17      Q.  Okay.
18      **A.  Mike Patterson.**
19      Q.  P-A-T-T-E-R-S-O-N.
20      **A.  Uhm-hum.**
21      Q.  Is that a yes?
22      **A.  Yes, Patterson, and Barbara,**
23  **I don't remember the other name.  Sergio**
24  **Reale, Jenna Barnes, B-A-R-N-E-S.**

12

1      Q.  Barnes?
2      **A.  Yes, and Ryan Cavanaugh.**
3      Q.  I'm sorry?
4      **A.  Ryan Cavanaugh.  That is**
5  **about all I can remember right now.**
6      Q.  Ms. Wolf, what was her job
7  title?
8      **A.  Accounts receivable and**
9  **payable.**
10      Q.  Does she still work at
11  Express Products?
12      **A.  Yes.**
13      Q.  Mr. Isabella, what was his
14  job title?
15      **A.  Sales representative.**
16      Q.  Is that the same thing as
17  account manager?
18      **A.  I don't know what is the**
19  **difference.**
20      Q.  Mr. Patterson, what was his
21  job title?
22      **A.  Shipping manager.**
23      Q.  Does Mr. Isabella still work
24  at Express Products?

13

1      **A.  Yes.**
2      Q.  Does Mr. Ellis?
3      **A.  Yes.**
4      Q.  What is Mr. Addison's job
5  title?
6      **A.  Mr. Who?**
7      Q.  Addison?
8      **A.  Patterson.  Shipping.**
9      Q.  Does Mr. Patterson still
10  work at Express Products?
11      **A.  No.**
12      Q.  Barbara, what was her job
13  title?
14      **A.  Shipping.**
15      Q.  Does she still work at
16  Express Products?
17      **A.  No.**
18      Q.  Mr. Reale?
19      **A.  Sales manager, sales**
20  **representative.**
21      Q.  Does he still work at
22  Express Products?
23      **A.  Yes.**
24      Q.  Ms. Barnes, what is her job

DAN GEIGER

14

1  title?
2        A.    Sales representative.
3        Q.    Does she still work at
4  Express Products?
5        A.    Yes.
6        Q.    Mr. Cavanaugh, what was his
7  job title?
8        A.    Sales representative.
9        Q.    Does he still work at
10  Express Products?
11       A.    No.
12       Q.    Was Mr. Cavanaugh terminated
13  or was he fired?
14       A.    No, he was not.
15       Q.    He quit on his own terms?
16       A.    Yes.
17       Q.    Are you able to determine
18  when employees worked for your company?
19       A.    Yes.
20       Q.    How would you determine
21  that?
22       A.    By looking up their records.
23       Q.    What records would show when
24  each employee worked?

15

1        A.    Personnel file.
2        Q.    Do the employees stamp or
3  clock in and clock out every day?
4        A.    Yes.
5        Q.    Does somebody at Express
6  Products print out the times that people would
7  come in and come out?
8        A.    No, it is printed on the
9  clock on the timecards.
10       Q.    Okay, but at some point do
11  those sheets of paper, does it get printed
12  out?
13       A.    No.
14       Q.    Explain to me how, if I
15  wanted to know when Mr. Cavanaugh worked at
16  Express Products, how would you be able to
17  find out?
18       A.    From the pay records.
19       Q.    Did you use an outside
20  source or company like ADP?
21       A.    Yes.
22       Q.    Do you use ADP?
23       A.    Yes.
24       Q.    Did you use ADP in 2003?

16

1        A.    I am not sure.
2        Q.    Who would you have used
3  before ADP?
4        A.    Paychecks.
5        Q.    Have you searched your
6  records to see when Mr. Cavanaugh worked for
7  Express Products?  Have you done that search?
8        A.    Yes.
9        Q.    What did you come up with?
10       A.    I don't remember now.
11       Q.    Did you print out some
12  documents?
13       A.    No.
14       Q.    Did you determine when he
15  worked?
16       A.    Yes.
17       Q.    What was your determination?
18  What was the results of the search?
19       A.    The date, years he started,
20  and the day he finished.
21       Q.    And what were the dates that
22  he started and what were the dates that he
23  finished?
24       A.    Don't recall now.  I do not

17

1  recall the dates now.
2        Q.    Did you do the search
3  because of this case?
4        A.    Yes.
5        Q.    Did you print out any
6  documents that showed when Mr. Cavanaugh
7  worked and ended work?
8        A.    No.
9        Q.    You were able to determine
10  when he worked?
11       A.    Yes.
12       Q.    What did you do to do that
13  search?  Did you look at the payroll records?
14       A.    Look in his file.
15       Q.    And in the file, did it show
16  when he worked and when he ended work?
17       A.    Yes.
18       Q.    Did it show how many hours a
19  day he worked for each day?
20       A.    Not in the file.
21       Q.    What was in the file?
22       A.    Job application, starting
23  date, finishing date, salary or compensation,
24  and a copy of his driver's license, a copy of

DAN GEIGER

18

1  his Social Security, if he had a Social
2  Security number, phone number for nearest
3  relative. In other words, personal
4  information.
5      Q.   My question to you is are
6  you able to determine how many hours a day he
7  worked on every day? That would be in the
8  file, that wouldn't --
9      A.   That would be in the pay
10 records.
11     Q.   Did you check the pay
12 records at all because of this case?
13     A.   No.
14     Q.   Who was responsible for
15 making the decisions to advertise at Express
16 Products?
17     A.   I am.
18     Q.   Is there anybody other than
19 yourself that is responsible for the decisions
20 to advertise at Express Products?
21     A.   No.
22     Q.   When is the first time that
23 Express Products advertised by fax?
24     A.   I don't remember.

20

1  Robert Diminivich?
2      A.   Never.
3      Q.   How many times have you
4  spoken to Gary?
5      A.   I will guess five.
6      Q.   How much did Express
7  Products agree to pay Mail2Media to send out
8  the faxes?
9      A.   I think the rate was about
10 five cents.
11     Q.   Five cents per successful
12 transmission; is that correct?
13     A.   Successful and unsuccessful.
14     Q.   So, did you pay Mail2Media
15 to send out faxes that were unsuccessful
16 transmissions?
17     A.   I think so.
18     Q.   Has the price of five cents
19 always been the same?
20     A.   To my recollection, yes.
21     Q.   How did it change?
22     MS. MESPLOU: He just said,
23 to my recollection yes.
24 BY MR. KELLY:

19

1      Q.   Did Express Products use a
2  fax broadcaster to send out faxes?
3      A.   Yes.
4      Q.   Who did it use?
5      A.   Mail2Media, Mail2Media.
6      Q.   Has Express Products ever
7  used a broadcaster other than Mail2Media?
8      A.   No.
9      Q.   How did you become aware of
10 Mail2Media?
11     A.   Don't remember.
12     Q.   How did you first come up
13 with the idea to advertise by fax?
14     A.   A lot of our customers asked
15 us for information of new products and
16 specials.
17     Q.   Have you ever spoken to
18 anybody at Mail2Media?
19     A.   Yes.
20     Q.   Who?
21     A.   A guy called Gary.
22     Q.   What is his last name?
23     A.   Don't know.
24     Q.   Have you ever spoken to

21

1      Q.   Who at Express Products was
2  responsible for giving the list to Mail2Media?
3      A.   Me.
4      MS. MESPLOU: I am going to
5  object. Your question assumes the
6  existence of a list.
7      MR. KELLY: Okay.
8  BY MR. KELLY:
9      Q.   Was there anybody else at
10 Express Products that was involved with
11 contact with Mail2Media?
12     A.   No.
13     Q.   To your knowledge, has any
14 Express Products employee ever spoken to or
15 communicated with Mail2Media?
16     A.   No.
17     Q.   Have you ever emailed
18 Mail2Media?
19     A.   Yes.
20     Q.   What is your email address?
21     MS. MESPLOU: He doesn't
22 have to give it.
23     MR. KELLY: Well, it could
24 be discoverable, emails to and

DAN GEIGER

22

1  from the broadcaster.
2      MS. MESPLOU: I understand,
3  but you have those.
4      MR. KELLY: I can always ask
5  what his email address is.
6      MS. MESPLOU: If you would
7  prefer to give it off the record,
8  just giving contact information on
9  the record, on the deposition
10  transcript --
11      MR. KELLY: It is an email
12  address. It is not his Social
13  Security number.
14      MS. MESPLOU: I am just --
15      MR. KELLY: I am not going
16  to send you junk mail.
17  BY MR. KELLY:
18      Q.   What is your email address?
19      A.   **Dan@1888express.com.**
20      Q.   Is that the email address
21  that you had at Express Products since its
22  start?
23      A.   **No.**
24      Q.   What is dan@1888express.com,

23

1  your current email address?
2      A.   **Yes.**
3      Q.   What email address did you
4  have before?
5      A.   **Something at Erols.com. It**
6  **was my -- it wasn't my name. I don't**
7  **remember.**
8      Q.   It is not "something"?
9      A.   **Well, I don't remember what**
10  **was the something.**
11      Q.   Did it have the
12  1888express.com?
13      A.   **No, it is at Erols.com,**
14  **E-R-O-L-S.**
15      Q.   E-R-O-L-S?
16      A.   **Yes.**
17      Q.   What is that?
18      A.   **It is the same like Comcast.**
19  **It is a carrier.**
20      Q.   Did you have the email
21  address dan@1888express.com for the last five
22  years or how long have you had it?
23      A.   **Possibly.**
24      Q.   Has anybody at Mail2Media

24

1  ever emailed you, wrote you a letter, or
2  emailed you a letter?
3      A.   **Yes.**
4      Q.   Did that come from Gary at
5  Mail2Media?
6      A.   **Yes.**
7      MR. KELLY: Let's mark -- I
8  am not sure. Is this a three-page
9  exhibit? It seems like it.
10      MS. MESPLOU: I think so.
11      MR. KELLY: We will just
12  keep it as a three page exhibit.
13  BY MR. KELLY:
14      Q.   I am showing you what was
15  previously marked as Plaintiff's Exhibit-5.
16  It is a three-page document. Do you see that?
17      A.   **Yes.**
18      MS. MESPLOU: Here is the
19  first page and then two pages
20  after that.
21  BY MR. KELLY:
22      Q.   Do you see that?
23      A.   **Yes.**
24      Q.   The first page, who has the

25

1  email address, dang1888express.com?
2      A.   **I do.**
3      Q.   What does "dang" stand for?
4      A.   **Dan, and my first initial,**
5  **my first, Dan Geiger.**
6      Q.   All right. Does Express
7  Products currently advertise by fax?
8      A.   **No.**
9      Q.   Did Express Products stop
10  advertising by fax when it received notice of
11  the lawsuit?
12      A.   **Before.**
13      Q.   How soon before?
14      A.   **About November of '04.**
15      Q.   October, November of 2004?
16      A.   **Right.**
17      Q.   Yes?
18      A.   **Yes.**
19      Q.   Why did you make the
20  decision to stop advertising by fax?
21      A.   **It wasn't financially viable**
22  **any more.**
23      Q.   October, November.
24      MS. MESPLOU: Are you done

DAN GEIGER

26

1    with the exhibit for now?
2         MR. KELLY: Yes, I think I
3    am done with it.
4    BY MR. KELLY:
5    Q.   How did you give the list to
6    Mail2Media?
7         MS. MESPLOU: Objection.
8    Foundation, form, assumes the
9    existence of a list. You can
10   answer.
11        THE WITNESS: Huh?
12        MS. MESPLOU: You can
13   answer.
14        MR. KELLY: Let me ask you
15   this.
16   BY MR. KELLY:
17   Q.   How did you compile the
18   company, companies, to be faxed your
19   advertisements?
20        MS. MESPLOU: Do you
21   understand the question?
22        THE WITNESS: I don't
23   understand.
24   BY MR. KELLY:

27

1    Q.   You used Mail2Media to send
2    out advertisements by fax, correct?
3    **A.   Yes.**
4    Q.   You needed to tell
5    Mail2Media who to fax, correct?
6    **A.   Yes, yes.**
7    Q.   How did you do that?
8    **A.   By emailing Mail2Media a
9    file with all the fax and numbers.**
10   Q.   How was the file stored.
11   Was it an Excel spreadsheet?
12   **A.   It was a spreadsheet.**
13   Q.   Was it in Excel?
14   **A.   No.**
15   Q.   Which program?
16   **A.   Open Office.**
17   Q.   Open Office?
18   **A.   Yes.**
19   Q.   What information for each
20   company did you send to Mail2Media?
21   **A.   Company name, fax number.**
22   Q.   Anything else, contact,
23   name?
24   **A.   Contact, and name, yes.**

28

1    Q.   So, were there three columns
2    in the spreadsheet?
3    **A.   Yes.**
4    Q.   How was the spreadsheet
5    created?
6    **A.   It was exported from our
7    accounting software.**
8    Q.   What is the name of the
9    accounting software?
10   **A.   ProBooks.**
11   Q.   Were you the person at
12   Express Products that exported the information
13   into the spreadsheet?
14   **A.   Yes.**
15   Q.   How often would you send
16   advertisements by fax?
17   **A.   About 40 times a year.**
18   Q.   40?
19   **A.   40, maybe.**
20   Q.   Did you email Mail2Media a
21   different spreadsheet every time?
22   **A.   Yes.**
23        MS. MESPLOU: Let me just
24   clarify. Different in what way?

29

1         MR. KELLY: Well, there
2    would be names that potentially
3    could be changed for each
4    broadcast. It wasn't the same
5    company names over and over again.
6    It could change.
7         THE WITNESS: It could
8    change. It is a new file. Every
9    time it is a new file.
10   BY MR. KELLY:
11   Q.   So, every time you asked
12   Mail2Media to do a broadcast, you would give
13   them the spreadsheet, correct?
14   **A.   Correct.**
15   Q.   How did you export the
16   companies into the spreadsheet? What did you
17   need to do? What search or what did you need
18   to do?
19   **A.   I have to go to the reports
20   section in there, in ProBooks, tell it which
21   fields I want, which file format I want, and
22   just hit the button.**
23   Q.   Which fields did you want?
24   **A.   Fax number, company name,**

DAN GEIGER

30

1  contact name.
2      Q.   What file format did you
3  want?
4      **A.   Spreadsheet.**
5      Q.   Were all the companies that
6  were on the spreadsheet companies that had
7  purchased products from Express Products?
8      **A.   No.**
9      Q.   How would a company get into
10 ProBooks without purchasing products?
11     **A.   By being contacted via**
12 **phone.**
13     Q.   So, anytime there was a
14 contact between Express Products and a
15 company, the company information would be
16 included in the ProBooks?
17     **A.   Some were -- yes.**
18     Q.   How else would a company
19 appear on ProBooks, any other way?
20     **A.   No.  No contact, without**
21 **contact, it would not have been in ProBooks.**
22     Q.   Who generally would make the
23 first contact?
24     **A.   A sales rep.**

31

1      Q.   Now, a sales rep would work
2  out of GoldMine software program; is that
3  right?
4      **A.   GoldMine and ProBooks.**
5      Q.   Okay.  Whenever a sales rep
6  would talk to a company, would he record what
7  was said on GoldMine or ProBooks?
8      **A.   ProBooks.**
9      Q.   Was Mr. Cavanaugh a sales
10 rep?
11     **A.   Yes.**
12     Q.   When a sales rep would
13 contact a company, would the sales rep
14 identify what was said on the GoldMine
15 software program?
16     **A.   In the ProBooks program.**
17     Q.   So, it wouldn't be GoldMine,
18 correct?
19     **A.   Some sales people prefer to**
20 **put it in both.  Company policy it is in**
21 **ProBooks.**
22     Q.   Why would a sales rep want
23 to put it in both?
24     **A.   Personal preference.**

32

1      Q.   Would the companies that
2  were put in GoldMine ever exported into the
3  spreadsheet that was sent to Mail2Media?
4      **A.   No.**
5      Q.   How long has Express
6  Products used ProBooks?
7      **A.   Since day one.**
8      Q.   How long has Express
9  Products used GoldMine?
10     **A.   Five years.**
11     Q.   So, since approximately
12 when?
13     **A.   2001, 2002, maybe.**
14     Q.   In 2003, who managed the
15 sales reps?
16     **A.   Tony Isabella.**
17     Q.   Did you say his first name
18 is Tony?
19     **A.   (Witness nodding).**
20     Q.   Tony, does he still manage
21 the sales reps?
22     **A.   No.**
23     Q.   Who does?
24         MS. MESPLOU:  Who manages

33

1  the sales reps?
2         MR. KELLY:  Now.
3         THE WITNESS:  Now?
4         MR. KELLY:  Yes.
5         THE WITNESS:  Sandy Wolf.
6  BY MR. KELLY:
7      Q.   Do you have any independent
8  recollection of any of your conversations with
9  Gary at Mail2Media?
10     **A.   No.**
11     Q.   How would Mail2Media invoice
12 Express Products, through the mail, through
13 email, through fax?
14     **A.   We ran -- no.  We deposit in**
15 **the beginning of the year a certain number of**
16 **dollars and that's it.  There was no more**
17 **invoices.**
18     Q.   You were given a log-in ID
19 and a password; is that correct?
20     **A.   Yes.**
21     Q.   What was the log-in ID?
22     **A.   Don't know.**
23     Q.   What was the password?
24     **A.   Can't remember.**

DAN GEIGER

34

1    Q.    Do you have that information
2  at your office?
3        A.    No.
4    Q.    Did you throw it out?
5        A.    Yes.
6    Q.    When did you throw that
7  information out?
8        A.    Last time I replaced my
9  computer.
10    Q.    Would you need to log in
11  every time you requested a broadcast?
12        A.    Yes.
13    Q.    You would log in to
14  Mail2Media.com?
15        A.    It was Mail2Media website.
16  I don't know.
17    Q.    And it allowed you to upload
18  the spreadsheet?
19        A.    Correct.
20    Q.    Upload the advertisement,
21  correct?
22        A.    Yes.
23    Q.    And then you would hit the
24  button, send, correct?

36

1  confirmation report saying that the broadcast
2  had occurred?
3        A.    No.
4    Q.    Would you be able to
5  determine by going on the Mail2Media web site
6  whether the broadcast had occurred?
7        A.    I am not sure.
8    Q.    How would you first be able
9  to determine whether a broadcast occurred?
10        A.    I included my fax number in
11  the list.
12    Q.    So, just so I am clear, when
13  you received the fax, you understood that the
14  broadcast did occur?
15        A.    Yes.
16    Q.    Are you able to determine
17  which companies actually received the fax?
18        A.    Yes.
19    Q.    How would you do that?
20        A.    I never did.
21    Q.    If you wanted to, how would
22  you do that?
23        A.    Log on the web site.
24    Q.    There would be a link that

35

1        A.    No.
2    Q.    What would you do?
3        A.    Just upload the two files
4  and that's it.
5    Q.    Were you able to request
6  when the faxes were to be sent?
7        A.    Yes.
8    Q.    Would you request that the
9  faxes be sent the next day, in two days,
10  generally?
11        A.    Generally, when available.
12    Q.    As soon as possible?
13        A.    When available.  As soon as
14  possible cost more.
15    Q.    What does when available
16  mean?
17        A.    When the server is free.
18  When the server has available time.
19    Q.    Generally, when you
20  requested the faxes to be sent, how soon after
21  the request did they get sent?  I am talking
22  about a matter of hours, days, weeks, years?
23        A.    Usually it was in 24-hours.
24    Q.    Were you given a

37

1  would say like a past record or past reports?
2        A.    Yes.
3    Q.    You would click on and then
4  there would be -- would there be a list of
5  dates of all the broadcasts?
6        A.    Yes.
7    Q.    Click on one of the dates
8  and it would give you what advertisement was
9  sent and the company that received the fax?
10        A.    Yes.
11    Q.    Did you ever print out any
12  of those documents?
13        A.    No.
14    Q.    How did Mail2Media invoice
15  Express Products?  I know I asked you this,
16  but did they send you a paper invoice as well?
17        A.    No.
18    Q.    How were you informed that
19  the money that you had put in was down to a
20  certain level?  Would you get an email?
21        A.    Email.
22    Q.    Did that ever happen?
23        A.    No.
24    Q.    How much money did you

DAN GEIGER

38

1  originally put in?
2      **A.   $5,000.00.**
3      Q.   Was it just one $5,000.00
4  figure that you put in?
5      **A.   Yes.**
6      Q.   Did you use all $5,000.00?
7      **A.   I don't know.**
8      Q.   I am showing you what has
9  been marked as Plaintiffs Exhibit-1.  Have you
10 ever reviewed the invoices from Mail2Media?
11     **A.   I did review invoices from**
12 **Mail2Media.**
13     Q.   Does Plaintiff's Exhibit-1
14 accurately reflect all of the invoices from
15 Mail2Media?
16     MS. MESPLOU:  If you know.
17     THE WITNESS:  The question
18     was?
19     MS. MESPLOU:  Hold on one
20 second.  Just for the record,
21 Plaintiffs Exhibit-1 consists of
22 17 pages of Mail2Media documents.
23 So, if you know whether it
24 accurately shows all of the

39

1      invoices, you can answer, if you
2      know if this is all of them.
3      THE WITNESS:  I don't know.
4  BY MR. KELLY:
5      Q.   It would be the second to
6  the last page on Plaintiff's Exhibit-1.  It is
7  identified as invoice number 062004-075, with
8  the description of new list, email purchase?
9      MS. MESPLOU:  I am going to
10     object as to relevance.  This case
11     has nothing to do with emails.
12     MR. KELLY:  I can ask what
13     was purchased from Mail2Media.
14     You can answer.
15     MS. MESPLOU:  If you know.
16     THE WITNESS:  I can answer?
17     MS. MESPLOU:  Yes.
18     MR. KELLY:  Yes.
19     THE WITNESS:  Email list.
20 BY MR. KELLY:
21     Q.   So, you purchased an email
22 list from Mail2Media?
23     **A.   Correct.**
24     Q.   Did you ever buy a fax list

40

1  from Mail2Media?
2      **A.   Yes.**
3      Q.   Yes?
4      **A.   Yes.**
5      Q.   When was that?
6      **A.   It was together with the**
7  **email list.**
8      Q.   How many fax numbers did you
9  purchase?
10     **A.   Don't know.**
11     Q.   How was the fax list given
12 to you?
13     **A.   On a CD.**
14     Q.   Do you currently have the
15 CD?
16     **A.   No.**
17     Q.   What happened to the CD?
18     **A.   Don't know.**
19     Q.   Why did you purchase a fax
20 list?
21     **A.   It was thrown in as part of**
22 **the deal for the email list.**
23     Q.   Did you use the fax list to
24 send out advertisements by fax?

41

1      **A.   No.**
2      Q.   Why not?
3      **A.   Never used it.**
4      Q.   What were you told as to
5  what the fax list contained?  Companies?
6      **A.   Companies in the cellular**
7  **industry.**
8      Q.   Why wouldn't you have used
9  that list though?
10     **A.   Because we never did.  We**
11 **used our customer list.**
12     Q.   Did you ask for a fax list
13 from Mail2Media regarding companies from the
14 cellular industry?
15     **A.   No.**
16     Q.   Did you ask Mail2Media for
17 an email list relating to companies in the
18 cellular industry?
19     **A.   I did not ask.**
20     Q.   Did they offer those
21 services to you?
22     **A.   Yes.**
23     Q.   And you purchased those
24 services?

DAN GEIGER

42

1      A.   Yes.
2      Q.   And you paid for those
3  services, correct?
4      A.   Yes.
5      Q.   Did you use the email list
6  to send out emails?
7           MS. MESPLOU:  Objection as
8      to relevance.  You can answer.
9           THE WITNESS:  The purchase
10      price included one broadcast
11      email, one email broadcast.  So,
12      we did one email broadcast.
13  BY MR. KELLY:
14      Q.   Were you ever given the
15  identities of the email addresses?
16      A.   What do you mean?
17      Q.   Were you given the email
18  addresses on the CD?  You said you were given
19  a CD by Mail2Media?
20      A.   (Witness nodding).
21      Q.   Yes?
22      A.   Yes, I think.  I think.  I
23  am not sure.
24      Q.   Did the CD contain the email

43

1  addresses?
2      A.   I think so.
3      Q.   Did the CD contain the fax
4  numbers?
5      A.   Yes.
6      Q.   Did the fax numbers also
7  have company names associated with them?
8      A.   I guess so.
9      Q.   How about the addresses of
10  the company?
11      A.   No.
12      Q.   So, what information was
13  contained in the fax list?
14      A.   I don't remember.
15      Q.   Well, you said company name,
16  fax number.  Was there a contact name?
17      A.   I don't remember.
18      Q.   How did you send out the
19  email list?
20           MS. MESPLOU:  Object to
21      relevance.
22           You can answer.
23           THE WITNESS:  Can you
24      clarify?

44

1           MR. KELLY:  Yes.
2  BY MR. KELLY:
3      Q.   We have talked about how you
4  sent out or how you went into the Mail2Media
5  website to give them the advertisement and
6  spreadsheet.  Was it different for the email?
7      A.   It was an email since we
8  only did it one time.  We just uploaded the
9  actual file of what to send.
10      Q.   Where did you upload it
11  from?
12      A.   The website.
13      Q.   Mail2Media's?
14      A.   Yes.
15      Q.   So, when you logged in your
16  account, since you purchased the email list,
17  you would have access to that list?
18      A.   No.  This was done -- sorry.
19  This was as an attachment to an email to Gary.
20      Q.   So, you conducted the email
21  broadcast by sending an email to Gary saying
22  send and you attached an advertisement?
23      A.   Yes.
24      Q.   And then you said send the

45

1  advertisement to the email list?
2      A.   Correct.
3      Q.   Did you also tell Gary to
4  send the advertisement to the fax list that
5  you purchased from Mail2Media?
6      A.   No.
7           MS. MESPLOU:  Well, I want
8      to object to that because he said
9      he did not purchase the fax list,
10      it just came along with the email
11      list that he purchased.
12  BY MR. KELLY:
13      Q.   When is the last time you
14  went on the Mail2Media website?
15      A.   November or December of '04.
16      Q.   Were you still able to
17  access the email list?
18      A.   The email list was on a CD.
19      Q.   I understand now.  Did you
20  say that you had changed computers recently?
21      A.   Yes.
22      Q.   How soon or when did you do
23  that?
24      A.   Generally speaking, once a

DAN GEIGER



**46**

1  year.
2      Q.  Where would the computer be
3  that you used in 2003 and 2004?
4      **A.  If it is still serviceable,**
5  **I will reload it, in other words, put a new**
6  **operating system and give it to a sales rep or**
7  **any other station any place in the business.**
8      Q.  Are you able to identify
9  which computer you used in 2003?
10     **A.  No.**
11     Q.  Who did you give your 2003
12 computer to, do you recall?
13     **A.  No.**
14     Q.  How about your 2004
15 computer?
16     **A.  No.**
17     Q.  You don't recall?
18     **A.  I don't recall.  And it is**
19 **like a new computer, I am replacing everything**
20 **because I've got personal information and so**
21 **on, so, I wipe everything off.**
22     Q.  How many companies and fax
23 numbers were on the CD, 100, 1,000, 10,000,
24 100,000?

**47**

1          MS. MESPLOU:  I will object
2      again to relevance.  He said he
3      did not do anything with it.
4      You can answer.
5          THE WITNESS:  Off memory
6      from their invoice, it says about
7      10,000.
8  BY MR. KELLY:
9      Q.  Which?
10     **A.  How many on the CD.  I don't**
11 **know.**
12     Q.  What do you mean by their
13 invoice said 10,000?  Did they send you an
14 invoice?
15     **A.  Yes, you showed me.**
16     Q.  Can you show me in what is
17 Plaintiff's Exhibit-1 it says the invoice
18 regarding the email list or fax list that was
19 purchased from Mail2Media?
20         MS. MESPLOU:  This is the
21     one he showed you.
22         MR. KELLY:  Well, there is a
23     question pending, so.
24         MS. MESPLOU:  You told him

**48**

1      to look at it.  This is the one
2      that has to do with the email
3      list.
4          MR. KELLY:  The witness can
5      answer the question.
6          THE WITNESS:  Do you have
7      the letter or email from Gary to
8      me?
9  BY MR. KELLY:
10     Q.  I am showing you what has
11 been marked as Plaintiff's Exhibit-5.  You can
12 take a look at that.
13     **A.  It says 22,190.**
14     Q.  And you are referring to the
15 third page of Plaintiff's Exhibit-5, correct?
16     **A.  Yes.**
17     Q.  What --
18         MS. MESPLOU:  Let's take a
19     break for a second.
20         (At this point, a brief
21     recess was taken, at the
22     conclusion of which, the
23     deposition continued as follows):
24 BY MR. KELLY:

**49**

1      Q.  Did the fax list and the
2  email list come in one CD ROM?
3      **A.  I am not sure.**
4      Q.  Plaintiff's Exhibit-5, the
5  third page, identifies the quantity of the fax
6  list that was purchased by Express Products;
7  is that right?
8      **A.  I don't know if it is the**
9  **fax list, the email list, or both.**
10     Q.  Did Express Products write a
11 check to pay for the fax list?
12     **A.  Yes.**
13     Q.  Did Express Products write a
14 check to pay for the email list?
15     **A.  One check for both.**
16     Q.  If you review the invoice
17 dated June 25, 2004, is it your recollection
18 that you paid $1,201.73 for the email list?
19         MS. MESPLOU:  Which list?
20         MR. KELLY:  Well, for the
21     list.
22         THE WITNESS:  Email list,
23     yes, list email purchase.
24 BY MR. KELLY:

DAN GEIGER

---

**50**

1    Q.   Is it your recollection that
2  the $1,200 figure includes both the email list
3  and the fax list?
4    **A.   Say again?**
5    Q.   Is it your recollection that
6  the $1,200 figure is the purchase of both the
7  email list and the fax list?
8    **A.   No, it is for the email**
9  **list. The fax list was not purchased as such,**
10  **as a separate item.**
11    Q.   Was it given to you for
12  free?
13    **A.   Basically, yes.**
14    Q.   Was it given to you in the
15  same CD ROM that included the email list?
16    **A.   I don't remember.**
17    MS. MESPLOU: He said he
18  can't remember.
19    THE WITNESS: I don't
20  remember if it was one or two. I
21  don't remember.
22  BY MR. KELLY:
23    Q.   How many checks did you
24  write to Mail2Media?

---

**51**

1    **A.   I don't recall how many,**
2  **but very few.**
3    Q.   Do you currently have copies
4  of your emails from the dang@1888express.com?
5    **A.   Ask the question again?**
6    Q.   Do you currently have your
7  emails from the dang@1888express.com?
8    MS. MESPLOU: All of them?
9    MR. KELLY: I am asking, do
10  you have them?
11    THE WITNESS: No.
12  BY MR. KELLY:
13    Q.   You no longer use that email
14  address?
15    **A.   That's correct.**
16    Q.   If I asked you to retrieve
17  emails from that email address, how would you
18  attempt to obtain those emails?
19    **A.   I have no idea.**
20    Q.   Would you be able to do
21  that?
22    **A.   I don't think so.**
23    Q.   Why not?
24    **A.   How do you preserve email?**

---

**52**

1    Q.   Sorry?
2    **A.   You know, it is very limited**
3  **storage. I don't know. I don't keep emails**
4  **forever, so.**
5    Q.   Do you maintain a server at
6  Express Products?
7    **A.   Email server, no.**
8    Q.   Regular server?
9    **A.   Regular server, yes.**
10    Q.   How long have you had your
11  server?
12    **A.   Current server, since 2000.**
13    Q.   Did Express Products ever
14  sell any products to Business Pro
15  Communications?
16    **A.   I believe not.**
17    Q.   Has Express Products ever
18  sold any products to Direct Communications?
19    **A.   I believe not.**
20    Q.   Have you ever personally
21  spoken to Rupe Patel(ph.)?
22    **A.   No.**
23    Q.   Have you ever personally
24  spoken to Gary Peret, P-E-R-E-T?

---

**53**

1    **A.   No.**
2    Q.   Have you ever personally
3  spoken to Shawn Ham(ph.)?
4    **A.   No.**
5    Q.   Do you have any personal
6  knowledge of any contacts from any of the
7  employees at Express Products to Business Pro
8  Communications?
9    **A.   Yes.**
10    Q.   Personal knowledge?
11    MS. MESPLOU: As opposed to?
12    THE WITNESS: Can you be
13  more specific?
14    MR. KELLY: Sure.
15  BY MR. KELLY:
16    Q.   Do you have any independent
17  recollection of any communication that an
18  Express Products employee may have had with
19  Business Pro?
20    MS. MESPLOU: Independent
21  of?
22    MR. KELLY: Independent
23  recollection.
24    THE WITNESS: Well, there is

---

DAN GEIGER

**54**

1   a record in Pro Books considered
2   as independent.
3   BY MR. KELLY:
4   Q.   Well, my question to you is,
5   did you ever overhear any conversations with
6   any of Express Products employees with any
7   employees from Business Pro?
8   **A.   No.**
9   Q.   Did you overhear any
10  conversations between any employees from
11  Express Products with employees of Direct
12  Communications?
13  **A.   No.**
14  Q.   I am showing you what has
15  been marked as Plaintiffs Exhibit-7. Have you
16  ever seen that document before?
17  **A.   Yes.**
18  Q.   Were you the person at
19  Express Products that obtained the document?
20  **A.   Obtained documents, no, you**
21  **just gave it to me.**
22  Q.   All right. Your attorney
23  gave that Exhibit-7 to me. My question to you
24  is did you give Exhibit-7 to your attorney?

**56**

1   Q.   Who retrieved Exhibit-7.
2   **A.   I did.**
3   Q.   When did you do this?
4   **A.   Don't know.**
5   Q.   Was it before or after you
6   received notice of the lawsuit?
7   **A.   After.**
8   Q.   How soon after?
9   **A.   Don't know.**
10  Q.   Has Express Products been
11  sued in any other cases involving the sending
12  of unsolicited faxes?
13  **A.   No.**
14  Q.   Has anybody wrote you a
15  letter claiming that Express Products sent any
16  unsolicited faxes to them?
17  **A.   No.**
18  Q.   Have you ever settled any
19  claims relating to a company claiming that
20  they received an unsolicited fax from Express
21  Products?
22  **A.   No.**
23  Q.   Have you heard of the
24  Telephone Consumer Protection Act?

**55**

1   **A.   I don't recall if I gave it**
2   **to them or they got it out of the computer.**
3   Q.   Did your attorneys come to
4   the office and work on your computers?
5   **A.   No.**
6   Q.   So, it must have been
7   somebody at Express Products that printed
8   Exhibit-7 off of the Express Products's
9   computers?
10  **A.   It is possible.**
11  Q.   Who else would it have been?
12  **A.   I have no idea.**
13  MS. MESPLOU: Break now.
14  Come on, Dan.
15  (At this point, a brief
16  recess was taken, at the
17  conclusion of which, the
18  deposition continued as follows):
19  BY MR. KELLY:
20  Q.   Is Exhibit-7 a record from
21  Express Products?
22  **A.   Yes.**
23  Q.   How do you know that?
24  **A.   It came out of our computer.**

**57**

1   **A.   Yes.**
2   Q.   When was the first time you
3   heard of CPA?
4   **A.   A few years ago.**
5   Q.   Was it before or after
6   notice of this lawsuit?
7   **A.   Before.**
8   Q.   How soon before the notice
9   of the lawsuit?
10  **A.   Maybe a year.**
11  Q.   How did you first become
12  aware of the CPA?
13  **A.   By broadcast notices from**
14  **Mail2Media.**
15  Q.   Broadcast notices?
16  **A.   Like a newsletter.**
17  Q.   Would they typically send
18  you a newsletter?
19  **A.   Not typically.**
20  Q.   How often would they send
21  you a newsletter?
22  **A.   Two or three times a year.**
23  Q.   How would the newsletter be
24  given to you, by fax, email?

58

1    A.  Email.
2    Q.  Would you read the emails?
3  Would you read them?
4    A.  Most of the time.
5    Q.  Have you ever had any
6  discussions with Mail2Media regarding the
7  legality of sending out advertisements by fax?
8    A.  No.
9    Q.  How did you retrieve
10  Exhibit-7?
11    A.  What do you mean how did I
12  retrieve?
13    Q.  How did you retrieve the
14  paper copy that is identified as Exhibit-7?
15    A.  We printed it from the
16  computer.
17    Q.  From what software program?
18    A.  ProBooks.
19    Q.  And you did that after
20  notice of this lawsuit; is that correct?
21    A.  Correct.
22    Q.  What search did you do in
23  order to retrieve Exhibit-7?
24    A.  You go to the customer page

59

1  and click on the memo.
2    Q.  In this case, for Exhibit-7,
3  you searched Business Pro?
4    A.  Correct.
5    Q.  And the memo comments that
6  were included in Business Pro are identified
7  as Exhibit-7, is that true?
8    A.  That's true.
9    Q.  Are there any other comments
10  relating to Business Pro in the ProBook
11  software program?
12    A.  Related to Business Pro, no.
13    Q.  Did you search the GoldMine
14  software program for comments relating to
15  Business Pro?
16    A.  No.
17    Q.  Why not?
18    A.  Because ProBooks is where
19  all these comments and mail was kept.
20    Q.  Are there comments that are
21  kept in the GoldMine?
22    A.  Yes, it is possible.
23    Q.  You didn't search GoldMine?
24    A.  No.

60

1    Q.  As we sit here today, are
2  you able to determine whether or not there are
3  comments that relate to Business Pro?
4    A.  Say again?
5    MS. MESPLOU:  In GoldMine?
6    MR. KELLY:  Business Pro.
7    MS. MESPLOU:  Are you able
8    to search that there are comments
9    in Business Pro?
10  BY MR. KELLY:
11    Q.  As we sit here today, are
12  you able to determine whether there are
13  comments in the GoldMine program relating to
14  Business Pro?
15    A.  As I sit here, I've got no
16  access to the computer.
17    Q.  All right.  So, you don't
18  know one way or the other as we sit here
19  today, correct?
20    A.  Correct.
21    Q.  As you sit here today, are
22  you able to determine who created all the
23  entries that are identified in Exhibit-7?
24    A.  Yes.

61

1    Q.  Who?
2    A.  Salesman coded as number
3  700.
4    Q.  Who is that, who is salesman
5  700?
6    A.  Cavanaugh.
7    Q.  Sorry?
8    A.  Cavanaugh.
9    Q.  Did sales reps have numbers?
10    A.  Yes.
11    Q.  When you say Cavanaugh, are
12  you referring to Ryan Cavanaugh?
13    A.  Correct.
14    Q.  And Ryan Cavanaugh had the
15  700 number associated to him?
16    A.  At that time, yes.
17    Q.  Did Ryan Cavanaugh have any
18  other number associated to him?
19    A.  No.
20    MS. MESPLOU:  Break time.
21    Sorry.
22    (At this point, a brief
23    recess was taken, at the
24    conclusion of which, the

DAN GEIGER

**62**

1        deposition continued as follows):
2   BY MR. KELLY:
3        Q.   Are you able to determine
4   who created the entries that do not include
5   the number 700?
6        MS. MESPLOU:  Are you
7            referring to the entries at the
8            bottom, the entries?  We are
9            still on Exhibit-7, right?
10       MR. KELLY:  Right.
11       THE WITNESS:  Are you
12           talking about the entries at the
13           bottom?
14  BY MR. KELLY:
15       Q.   Let me just ask the
16  question.  Are you able to determine who
17  created the entries that do not include the
18  700 designation?
19       **A.   Well, I see a 500**
20  **designation.**
21       Q.   Do you know who the 500
22  designation is?
23       **A.   Not without looking at the**
24  **payroll records.**

**63**

1        Q.   Are you able to determine
2   who created the entries that do not include
3   the 500 or 700 designation?
4        MS. MESPLOU:  Can you point
5            to specific entries just for
6            simplicity sake.
7   BY MR. KELLY:
8        Q.   Any entries that don't
9   include the 500 or 700 designation, are you
10  able to determine who created those?
11       **A.   No.**
12       Q.   Is there any way to
13  determine who created the entries that don't
14  have the designation 500 or 700?
15       **A.   Only by assumption.**
16       Q.   I am showing you what has
17  been marked as Plaintiff's Exhibit-8.  Did you
18  personally create any of the entries on
19  Plaintiff's Exhibit-8?
20       **A.   No.**
21       Q.   Did you personally create
22  any of the entries on Plaintiff's Exhibit-7?
23       **A.   No.**
24       Q.   Back to Exhibit-7, why is

**64**

1   there a space in between the 1998 entries and
2   the entries from 2002 and 2003?
3        **A.   I don't know.**
4        Q.   How did the entries appear
5   when you searched for Business Pro in the
6   ProBooks program?
7        **A.   Text.**
8        Q.   When they were printed out
9   as text, did you print out the document?
10       **A.   Yes.**
11       Q.   And does Exhibit-7 truly and
12  accurately depict the way the printout looked
13  after printing it?
14       **A.   Yes.**
15       Q.   Did you make any entries to
16  the Business Pro call-log on ProBooks after
17  receiving notice of this lawsuit?
18       **A.   No.**
19       MS. MESPLOU:  Off the
20           record.
21       (Discussion off the record).
22  BY MR. KELLY:
23       Q.   Do you have any personal
24  knowledge as to when any of the entries that

**65**

1   are identified in Exhibit-7 were created?
2        **A.   No.**
3        Q.   Do you have any personal
4   knowledge as to when the entries in Exhibit-8
5   were created?
6        **A.   No.**
7        Q.   Does every employee have
8   access to the ProBooks program?
9        **A.   Yes.**
10       Q.   And any employee can create
11  comments relating to a specific company on the
12  ProBooks program?
13       **A.   Not any employee, only sales**
14  **people.**
15       Q.   What is OEM?
16       **A.   Original equipment**
17  **manufacturer.**
18       Q.   What is that as it relates
19  to your business, or what does that mean?
20  What does that term mean?
21       **A.   It means you want product**
22  **made by Motorola or Nokia, people who made the**
23  **phone.**
24       Q.   Okay.  What are BCHs?

DAN GEIGER

66

1      **A.   Belt clip holster.**
2      Q.   Is that the clip that you
3  would put on your belt to hold your cell
4  phone?
5      **A.   Yes.**
6      Q.   Did you search your records
7  to determine who the designated 500 employee
8  was?
9      **A.   No.**
10      Q.   Are there any comments in
11  the ProBooks program that relate to Business
12  Pro that are not included in Exhibit-7?
13      **A.   No.**
14      Q.   Did you delete or add any
15  entries as it relates to Business Pro since
16  the notice of the lawsuit?
17      **A.   No.**
18      Q.   Based upon your review of
19  Exhibit-7, do you see anywhere that shows that
20  anybody at Business Pro requested to receive
21  advertisements by fax from Express Products?
22      MS. MESPLOU: Take your time
23      to read it, if you need to.
24      THE WITNESS: No.

67

1      MR. KELLY:  Can I have the
2  last question and answer read
3  back.
4      (At this point, the court
5  reporter repeated the following:
6      "QUESTION: Based upon your
7      review of Exhibit-3, do see
8      anywhere that shows that anybody
9      at Business Pro requested to
10      receive advertisements by fax from
11      Express Products?")
12  BY MR. KELLY:
13      Q.   Based upon your review of
14  Exhibit-7, do you see anywhere that shows that
15  anybody at Direct Communications requested to
16  receive advertisements by fax from Express
17  Products?
18      **A.   Exhibit-7 is for Business
19  Pro.**
20      Q.   So, the answer to my
21  question would be no, you don't see anywhere
22  on Exhibit-7 that shows that anybody from
23  Direct Communications requested to receive
24  advertisements by fax from Express Products;

68

1  am I correct?
2      **A.   Correct.**
3      Q.   Am I correct in stating that
4  based upon Exhibit-7, you cannot identify
5  anybody at Business Pro that requested to
6  receive advertisements by fax; is that
7  correct?
8      **A.   Correct.**
9      Q.   Am I also correct in stating
10  that based upon your review of Exhibit-7 you
11  are unable to determine anybody at Direct
12  Communications that had requested to receive
13  advertisements by fax from Express Products;
14  is that correct?
15      **A.   Yes.**
16      Q.   Does Express Products have
17  any documents that show that anybody at
18  Business Pro requested to receive
19  advertisements by fax from Express Products?
20      **A.   No.**
21      Q.   Does Express Products have
22  any documents that show that anybody at Direct
23  Communications requested to receive
24  advertisements by fax from Express Products?

69

1      **A.   No.**
2      Q.   Has anybody at Express
3  Products at anytime ever told you that anybody
4  at Business Pro ever requested to receive
5  advertisements by fax from Express Products?
6      **A.   I cannot recall.**
7      Q.   As you sit here today, do
8  you recall any conversations that you had with
9  anybody at Express Products where they told
10  you that Business Pro had requested to receive
11  advertisements by fax from Express Products?
12      **A.   Can you repeat?**
13      MR. KELLY: Can you read
14      that back?
15      (At this point, the court
16  reporter repeated the following:
17      "QUESTION: As you sit here
18      today, do you recall any
19      conversations that you had with
20      anybody at Express Products where
21      they told you that Business Pro
22      had requested to receive
23      advertisements by fax from Express
24      Products?")

DAN GEIGER

70

1       THE WITNESS: No.
2   BY MR. KELLY:
3       Q.   As you sit here today, do
4   you have a recollection of speaking with
5   anybody at Express Products in which they told
6   you that Direct Communications had requested
7   to receive advertisements by fax from Express
8   Products?
9       **A.   No.**
10      Q.   What is I-1000 Concord?
11      **A.   NexTel I-1000.**
12      Q.   It is a Concord?
13      **A.   No, it is a phone.**
14      Q.   What is the 8260?
15      **A.   Nokia.**
16      Q.   Nokia?
17      **A.   Yes.**
18      Q.   If an Express Products sales
19  rep would say to a company use us as a
20  fill-in, what does that mean?
21      **A.   It means if your regular**
22  **supplier is out of that product, maybe we find**
23  **it, and you buy it from us.**
24      MR. KELLY: We can take a

71

1       break at anytime you want, just so
2   you know that, okay?
3       THE WITNESS: Okay.
4       MR. KELLY: Don't think you
5   are chained inside here.
6       MS. MESPLOU: I think he
7   knows by now.
8   BY MR. KELLY:
9       Q.   Plaintiffs Exhibit-8, did
10  you personally print out this document?
11      **A.   Yes.**
12      Q.   When did you personally
13  print it out?
14      **A.   Don't recall.**
15      Q.   Was it before or after
16  notice of the lawsuit?
17      **A.   After.**
18      Q.   Did you print out Exhibit-8
19  at or near the time of when you printed out
20  Exhibit-7?
21      **A.   Yes.**
22      Q.   When you printed out
23  Exhibit-7 and Exhibit-8, did you immediately
24  hand the documents over to your attorney?

72

1       **A.   It was in a short period.**
2       Q.   A short period of time would
3   be a matter of days, weeks?
4       **A.   Yes, days.**
5       Q.   Exhibit-8, is that a
6   printout of ProBooks as it relates to Direct
7   Communications?
8       **A.   Yes.**
9       Q.   Did you do any other search
10  at Express Products for any information as it
11  relates to Business Pro?
12      **A.   No.**
13      Q.   Did you do any other search
14  at Express Products as it relates to Direct
15  Communications?
16      **A.   No.**
17      Q.   Have you spoken to Ryan
18  Cavanaugh since he left Express Products?
19      **A.   No.**
20      Q.   Did you request that any
21  other searches be done relating to Business
22  Pro?
23      **A.   Request whom?**
24      Q.   Anybody at Express Products.

73

1       **A.   No.**
2       Q.   Did you request anybody at
3   Express Products to conduct a search for
4   Direct Communications?
5       **A.   No.**
6       Q.   So, you personally did all
7   the searches, correct?
8       **A.   Correct.**
9       Q.   And you've told me about all
10  the searches that you have done?
11      **A.   Yes.**
12      Q.   Did you ever search the
13  GoldMine program for information relating to
14  Direct Communications?
15      **A.   No.**
16      Q.   Do you have any other
17  databases that may have information relating
18  to Business Pro or Direct Communications?
19      **A.   No.**
20      Q.   Does Exhibit-8 identify all
21  of the comments relating to Direct
22  Communications that was on the ProBooks
23  program?
24      **A.   Yes.**

DAN GEIGER



**74**

1    Q.   Is Exhibit-8 a true and
2  accurate copy of the printout from ProBooks?
3    **A.   Yes.**
4    Q.   Did you have to
5  cut-and-paste these comments somewhere in
6  order to print them out or were you able to
7  just print them out the way they look as
8  Exhibit-8?
9    **A.   No, same way.**
10    Q.   What are NAVs?
11    **A.   I don't know.**
12    Q.   Have you ever had an
13  employee at Express Products named Ryan other
14  than Ryan Cavanaugh?
15    **A.   No.**
16    Q.   Do you have any personal
17  knowledge as to when the entries that are
18  identified in Exhibit-8 were entered into the
19  ProBooks program in relation to when the
20  actual phone call took place?
21    **A.   Yes, same day.**
22    Q.   How do you know that?
23    **A.   Company policy.**
24    Q.   Is it the policy for the

**75**

1  sales rep to type comments in or write the
2  comments down on a piece of paper?
3    **A.   Type in.**
4    Q.   Have any of your sales reps
5  ever written the comments down on a note pad?
6    **A.   Not that I am aware of.**
7    Q.   Am I correct in stating that
8  the comments on Exhibit-8 relate to phone
9  calls or attempted phone calls to phone number
10  949-5780; is that true?
11    **A.   That's correct.**
12    Q.   Am I also correct in stating
13  that the comments identified in Exhibit-7
14  relate to phone calls or attempted phone calls
15  to phone number 949-5780; is that true?
16    **A.   That's correct.**
17    Q.   And IL, that refers to
18  Illinois?
19    **A.   Yes, correct.**
20    Q.   Does Express Products have
21  any phone numbers for Direct Communications
22  other than 949-5780?
23    MS. MESPLOU:  If you know.
24    THE WITNESS:  It is

**76**

1    possible.
2  BY MR. KELLY:
3    Q.   Does Express Products have
4  any other phone numbers for Business Pro other
5  than 949-5780?
6    **A.   It is possible.**
7    Q.   Am I correct in stating when
8  you searched for comments you searched by
9  company name and not by phone number; is that
10  correct?
11    **A.   Correct.**
12    Q.   Am I correct in stating that
13  all of the comments that relate to Business
14  Pro, Direct Communications are identified in
15  Exhibit-7 and Exhibit-8?
16    **A.   Yes.**
17    Q.   What was the policy at
18  Express Products for removing phone numbers,
19  fax numbers, from those people who do not wish
20  to receive faxes?
21    **A.   Removing phone number or fax**
22  **numbers?**
23    Q.   Fax numbers?
24    **A.   The policy is that we remove**

**77**

1  **them.**
2    Q.   When somebody requested that
3  Express Products not send them any more faxes,
4  who was in charge of that job?
5    **A.   I am.**
6    Q.   What would you do when you
7  would receive a fax stating please remove me
8  from the list?
9    **A.   I would either delete the**
10  **fax number or turn in ten 9s.**
11  **9-9-9-9-9-9-9-9-9.**
12    Q.   How often would you do that
13  on a weekly, monthly basis?
14    **A.   Daily.**
15    Q.   Did anybody at Business Pro
16  ever request to be taken off the list?
17    **A.   No.**
18    Q.   Did you keep the
19  advertisements that the companies requested to
20  be taken off?
21    **A.   Yes.**
22    Q.   Did Express Products ever
23  fax to any residents?
24    **A.   No.**

DAN GEIGER

78

1    Q.    Express Products always
2 faxed to companies, correct?
3        A.    Correct.
4            MR. KELLY:  Go off the
5    record.
6            (Discussion off the record).
7 BY MR. KELLY:
8    Q.    Do you have comments in
9 ProBooks for all of your customers?
10        A.    Yes.
11    Q.    Did Ryan Cavanaugh work off
12 of GoldMine or ProBooks?
13        A.    ProBooks.
14    Q.    Does Sergio Reale, is his
15 name?
16        A.    Yes.
17    Q.    Did he work off of GoldMine
18 or ProBooks?
19        A.    ProBooks.
20    Q.    Did Ryan Cavanaugh ever work
21 off of GoldMine?
22        A.    Yes.
23    Q.    To your knowledge, did Ryan
24 Cavanaugh ever put any comments in GoldMine?

79

1        A.    I have no knowledge.
2 However, if anybody puts comments in GoldMine,
3 they have to cut-and-paste it into ProBooks.
4    Q.    So, any comments that would
5 be in GoldMine would be in ProBooks?
6        A.    Correct.
7    Q.    Is that something that the
8 sales rep has to do or is it done
9 automatically?
10        A.    No, they have to do it.
11    Q.    And has that been the policy
12 of Express Products since 2002?
13        A.    Correct.
14    Q.    How did Express Products
15 figure out which sales reps would manage which
16 accounts?
17        A.    There is more than one way,
18 but the most common way is if a sales person
19 made contact and communication with a customer
20 and nobody else have made any contact for more
21 than three months, then he can have this
22 customer and under his code.
23    Q.    Did ProBooks identify the
24 sales reps by code?

80

1        A.    Correct.
2    Q.    Did GoldMine identify the
3 sales reps by code?
4        A.    Correct.
5    Q.    Were the codes consistent
6 with GoldMine and ProBooks?
7        A.    Correct.
8    Q.    Every company that is listed
9 in ProBooks, has it been designated a sales
10 rep?
11        A.    Yes.
12    Q.    Are you able to determine
13 who was assigned to Business Pro?
14        A.    Yes.
15    Q.    Who?
16        A.    There is a sales code.
17 There is a sales code associated with this
18 customer.
19    Q.    Which sales code was
20 associated with Business Pro?
21            MS. MESPLOU:  If you need to
22    look at anything, you can look.
23            THE WITNESS:  No, it varies
24    with time.  It can be 500.  It can

81

1    be 700.
2 BY MR. KELLY:
3    Q.    Is that based upon -- do the
4 codes need to be changed?
5        A.    Yes, it can be changed.
6    Q.    Who makes the determination
7 as to when the code would be changed for each
8 particular company?
9        A.    Sales manager.
10    Q.    In this case, who with
11 respect to Business Pro?  Can you identify all
12 the sales reps that were associated with
13 Business Pro?
14        A.    By looking at the log and
15 comparing it to employment, yes.
16    Q.    But as you sit here today,
17 you cannot identify the sales reps that were
18 the sales reps for Business Pro?
19        A.    Without looking at the
20 employment record, no.
21    Q.    Who is in charge of creating
22 the advertisements that were sent by fax?
23        A.    Sergio.
24    Q.    Did you ever create any of

DAN GEIGER

82

1  the advertisements?
2      A.  No.
3      Q.  Did you ever have to
4  authorize the content of the advertisements or
5  you just relied on Sergio?
6      A.  I did rely on Sergio.
7      Q.  Did Express Products ever
8  have a removal number that an outside company
9  used to remove fax numbers?
10     A.  No.
11         THE WITNESS:  Can we take a
12  break?
13         MR. KELLY:  Sure.
14         (At this point, a brief
15         recess was taken, at the
16         conclusion of which, the
17         deposition continued as follows):
18  BY MR. KELLY:
19     Q.  You compiled a list of
20  advertisements where companies did not want to
21  be faxed advertisements anymore, correct?
22     A.  Not true.
23     Q.  Did you give your attorney
24  some documents where it says do not fax?

83

1      A.  Yes.
2      Q.  Were you able to determine
3  whether or not anybody at Business Pro or
4  Direct Communications requested not to receive
5  any advertisements by fax?
6      A.  The fax number was still in
7  ProBooks, which means they did not request to
8  be removed.
9      Q.  It was your policy to keep
10  copies of all the advertisements where
11  companies did not want to be faxed anymore?
12     A.  Yes.
13     Q.  And you kept all of them?
14     A.  Yes.
15     Q.  Did you review the
16  advertisements to see if Business Pro or
17  Direct Communications desired not to be faxed
18  anymore?
19     A.  No.
20     Q.  Did you review the
21  deposition transcript of Robert Diminivich
22  from Mail2Media?
23     A.  No.
24     Q.  Did you review the

84

1  deposition transcript of Rupe Patel?
2      A.  No.
3      Q.  Have you spoken to anybody
4  other than your attorney regarding the subject
5  matter of this case?
6      A.  No.
7          MR. KELLY:  I want to look
8  at the header of this stuff.  Do
9  you have a better copy of these
10  advertisements?
11         THE WITNESS:  It seems like
12  these three the header is taken
13  off.
14         MS. MESPLOU:  That's what I
15  have.
16         MR. KELLY:  Let's see what
17  you got.
18         MS. MESPLOU:  Mine are the
19  ones that came off the Diminivich
20  deposition too.
21         MR. KELLY:  I have got
22  better copies.  Let me just see
23  here.
24  BY MR. KELLY:

85

1      Q.  Based upon your review of
2  Exhibit-7 and Exhibit-8, do you see anywhere
3  where anybody gave out the fax number
4  847-855-2667 to anybody at Express Products?
5      A.  No.
6      Q.  Do you have any personal
7  knowledge as to how Express Products obtained
8  the fax number 847-855-2667, personal
9  knowledge?
10     A.  Personal, no.
11     Q.  Do you have any knowledge as
12  to when Express Products obtained the fax
13  number 847-855-2667?
14     A.  No.
15     Q.  Do you have any knowledge as
16  to the way in which Express Products obtained
17  the fax number 847-855-2667?
18         MS. MESPLOU:  Did you say
19  personal knowledge?
20         MR. KELLY:  Do you have any
21  knowledge?
22         THE WITNESS:  Yes.
23  BY MR. KELLY:
24     Q.  How?

DAN GEIGER

86

1    **A.    By calling the customer and**
2  **getting the fax number.**
3        Q.    Do you have any knowledge as
4  to which employee at Express Products obtained
5  the fax number 847-855-2667, if any?
6        **A.    Possibly the -- and I can't**
7  **say employee, in other words, whoever put the**
8  **first log-in log entry.**
9        Q.    And the first entry is
10  January 9, 1998; is that true?
11        **A.    That's true.**
12        Q.    Does the January 9, 1998
13  entry in any way identify that anybody at
14  Business Pro gave out its fax numbers, fax
15  number to Express Products?
16        **A.    No.**
17        Q.    You said I-1000 is what?
18        **A.    A Nextel cell phone.**
19        Q.    That is something that -- a
20  Nextel cell phone would be mailed out,
21  correct?
22        **A.    Say again?**
23        Q.    I am looking at the January
24  9, 1998 entry.  It appears that somebody at

87

1  Express Products allegedly sent a Nextel cell
2  phone catalog and a business card; is that
3  correct?
4        **A.    No.**
5        Q.    Based upon your review of
6  that entry, what was allegedly sent?
7        **A.    A sample of an accessory**
8  **that will work with a Nextel I-1000.**
9        Q.    Was anything else sent?
10        **A.    I cannot tell.**
11        Q.    Was the accessory mailed?
12        **A.    UPS.**
13        Q.    It was not faxed, correct?
14        **A.    Correct.**
15            MR. KELLY:  Some times you
16  have got to ask the question.
17  BY MR. KELLY:
18        Q.    Is there a way to determine
19  when a particular fax number was inputted into
20  the ProBooks?
21        **A.    No.**
22        Q.    In Exhibit-7, can you, based
23  upon your review of Exhibit-7, explain why
24  there was a gap between 1998 and 2002 as far

88

1  as why there apparently was no contact between
2  that time?
3        **A.    The possibilities are that**
4  **one salesman left and the customer was kind of**
5  **dropped off, nobody was calling trying to**
6  **solicit, trying to sell until someone else**
7  **picked it up.**
8        Q.    Did Express Products ever
9  purchase company names and phone numbers that
10  are interested in cell phone accessories when
11  you first started the company in order to
12  increase sales?
13        **A.    Yes.**
14        Q.    Where did you purchase that
15  list from?
16        **A.    A company called Info USA.**
17        Q.    When was that list
18  purchased?
19        **A.    Can't tell you.**
20        Q.    Was it some time in 1998?
21        **A.    Possibly.**
22        Q.    Does that sound around
23  accurate, that would be around the time frame?
24        **A.    Yes.**

89

1        Q.    Did the list contain fax
2  numbers?
3        **A.    No.**
4        Q.    Did any of the lists contain
5  fax numbers that you purchased from Info USA?
6        **A.    No.**
7        Q.    Are you able to tell whether
8  Business Pro was on the list that you
9  purchased from Info USA?
10        **A.    No.**
11        Q.    Did you use the list in -- I
12  guess, export it in from the ProBooks program?
13        **A.    No.**
14        Q.    What did you do with the
15  list?
16        **A.    The list was a printed list.**
17  **It will be distributed between sales people**
18  **and they will make phone calls.**
19        Q.    When they make the phone
20  calls --
21            MS. MESPLOU:  Were you done
22  answering?  I want to make sure.
23            THE WITNESS:  Yes.
24  BY MR. KELLY:

DAN GEIGER

90

1      Q.   When the sales rep would
2  make the phone calls, then the information
3  would then be put on the ProBooks system?
4      A.   Correct.
5      Q.   Do you currently have a hard
6  copy of the Info USA list?
7      A.   I doubt it.
8      Q.   Have you looked for it?
9      A.   No.
10     Q.   Was it put on CD ROM?
11     A.   It was printed.
12     Q.   How many companies did you
13  purchase?
14     A.   A few thousand.
15     Q.   How much did you pay?
16     A.   Don't know.
17     Q.   Do you currently have the
18  invoices from Info USA?
19     A.   No.
20     Q.   Have the sales reps called
21  everyone on the list presumably?
22     A.   I guess.
23     Q.   You guess.  Yes?
24     A.   I guess, yes.

91

1          MS. MESPLOU:  Don't guess.
2          THE WITNESS:  I don't know.
3  BY MR. KELLY:
4      Q.   That is the purpose of
5  buying the list, so you can contact those
6  people, correct?
7      A.   Yes.
8      Q.   And to the best of your
9  ability, or to the best of your knowledge, all
10  of them have been contacted?
11     A.   Yes.
12     Q.   Who was responsible for
13  implementing a procedure in which the original
14  phone call would be made to the people on the
15  list?
16     A.   Sales manager.
17     Q.   In 1998, who was the sales
18  manager?
19     A.   Tony Isabella.
20     Q.   He still works at Express
21  Products?
22     A.   Yes.
23     Q.   Are you able to determine
24  who the January 9, 1998 entry is on Exhibit-7?

92

1  Do you have an educated guess as to who that
2  would be or do you know who it would be?
3      A.   No.
4      Q.   Could it be Tony?
5      A.   No.
6      Q.   Why wouldn't it have been
7  Tony?
8      A.   Tony, he is salesman 400.
9      Q.   As we sit here today, can
10  you identify the names and the numbers that
11  are designated to the sales reps?
12     A.   Today, yes.
13     Q.   Why don't you give them to
14  me, if you can?
15     A.   Tony is 400.  Tony is 400.
16  Jenna is 300.  Jim is 200.  He is not on the
17  list.  He was outside.  He is not an employee.
18     Q.   Jim was 200?
19         MS. MESPLOU:  What, like an
20  independent contractor?
21         THE WITNESS:  1099, yes.
22  BY MR. KELLY:
23     Q.   Did you say 1999?
24     A.   1099.

93

1      Q.   Okay.  Who else?
2      A.   Mike is 500.
3      Q.   Okay.
4      A.   600 is Walt.
5      Q.   Is he an independent
6  contractor?
7      A.   No.
8      Q.   Walt?
9      A.   Yes.
10     Q.   He didn't work in 2003?
11     A.   Right.
12     Q.   Okay.
13     A.   And 800 is Sergio.
14     Q.   Who are the people that were
15  calling off the original list from Info USA in
16  1998, around 1998?
17     A.   Sales people.
18     Q.   Who would they have been,
19  names?
20     A.   (Witness nodding).
21     Q.   Tony would be the sales
22  manager?
23     A.   Tony would be one, Sergio
24  would be one, and whoever else was back then.

DAN GEIGER

94

1      Q.    And how many would there
2  have been?
3      A.    **About six, seven.**
4      Q.    Tony was the sales manager
5  in 1998?
6      A.    **Yes.**
7      Q.    Did you ever implement a
8  written policy with respect to what should be
9  said to the people, to the companies, that
10 were on the Info USA list?
11     A.    **No.**
12     Q.    Did you have an oral policy?
13     A.    **Yes.**
14     Q.    What was the oral policy?
15     A.    **Make contact, try to sell,**
16 **find out who are -- which carriers they sell**
17 **so we know what kind of phones they're**
18 **servicing.**
19     Q.    When was the first time that
20 you determined to send out advertisements by
21 fax?
22          MS. MESPLOU:  Objection.
23      Asked and answered.
24          THE WITNESS:  I don't

95

1      recall.
2  BY MR. KELLY:
3      Q.    Do you have an estimate?
4  Was it around the time you first started using
5  Mail2Media?
6      A.    **Yes.**
7      Q.    When the initial phone call
8  was made to the companies on the Info USA
9  list, would the purpose be to obtain the fax
10 number?
11     A.    **No.**
12     Q.    Would one of the purposes be
13 to obtain the fax number?
14     A.    **No.**
15     Q.    Did you instruct the sales
16 reps to obtain the fax number when making the
17 initial call to the companies on the Info USA
18 list?
19     A.    **No.**
20          MS. MESPLOU:  Off the
21      record, please.
22      (Discussion off the record).
23 BY MR. KELLY:
24     Q.    When would the fax numbers

96

1  be obtained from the companies?
2      A.    **When it was relevant.**
3      Q.    When it was relevant?
4      A.    **Yes.**
5      Q.    When would it be relevant?
6      A.    **When the customer will be**
7  **asked to be faxed.**
8      Q.    Were there times when sales
9  reps would call companies off the Info USA
10 list and acquire information including its fax
11 number?
12     A.    **No.**
13     Q.    Who was responsible for
14 putting fax numbers on the ProBooks system?
15     A.    **Sales person.**
16     Q.    Could a sales rep obtain the
17 fax number from any other way, other than the
18 company giving it to them during a telephone
19 conversation, such as like an invoice or any
20 other such means?
21     A.    **No.**
22     Q.    Is the only reason that
23 Express Products obtained fax numbers was to
24 send out advertisements by fax?

97

1      A.    **No.**
2      Q.    What would be some of the
3  other reasons why Express Products would want
4  companies' fax numbers?
5      A.    **Credit card authorization is**
6  **one example, some customers want to be faxed**
7  **an invoice.**
8      Q.    Is there any way to
9  determine on the ProBooks system as to if a
10 fax number appeared for a company whether that
11 fax number was given to Express Products to
12 receive advertisements by fax or for some
13 other reason?
14     A.    **Yes.**
15     Q.    I'm sorry.  I lost my
16 question.  How are you able to determine that
17 as to the reason why the fax number was given?
18     A.    **No, we cannot determine a**
19 **reason why.**
20     Q.    Okay.
21     A.    **But if it is not for**
22 **broadcast fax, it was put in a different**
23 **field.**
24     Q.    So, did ProBooks have a

DAN GEIGER

98

1 separate field for broadcast faxes?
2     **A.  Yes.**
3     Q.  The other field was named
4 what, just --
5     **A.  Just other forms.**
6     Q.  Did other forms also mean a
7 fax number?
8     **A.  It can be used as a fax**
9 **number, yes.**
10     Q.  Would a sales rep put in a
11 fax number in the broadcast column even though
12 a company never requested to receive
13 advertisements by fax?
14     **A.  No.**
15     Q.  Were the sales reps told in
16 2002 to collect phone numbers in order to send
17 out advertisements by fax?
18     **A.  Phone numbers?**
19     Q.  Fax numbers.
20     **A.  No.**
21     Q.  How did the fax numbers
22 appear in the fax broadcast column?
23     **A.  I don't understand the**
24 **question.**

99

1     Q.  You decided to send out
2 faxes in approximately 2002; is that correct?
3     **A.  Correct.**
4     Q.  It was only until 2002 that
5 sales reps would ask the companies for
6 permission to send out the advertising faxes,
7 correct?
8     **A.  Correct.**
9     Q.  Correct?
10     **A.  Correct.**
11     Q.  Did Express Products have a
12 policy in place as to how the sales reps would
13 request the fax numbers to form the fax
14 broadcast written policy?
15     **A.  No.**
16     Q.  Did Express Products have an
17 oral policy?
18     **A.  Yes.**
19     Q.  Did you instruct the sales
20 rep to specifically call the companies in
21 order to build the database?
22     **A.  No.**
23     Q.  What were the sales reps
24 instructed to do as it relates to obtaining

100

1 fax numbers for the fax broadcasts?
2     **A.  The calls to the customer**
3 **were in order to solicit selling, not faxes.**
4     Q.  Right.
5     **A.  If the customer was**
6 **interested and requests the weekly broadcast,**
7 **we will input the fax number.**
8     MR. KELLY:  Let's mark this
9 as Plaintiff's Exhibit-9.
10     (At this time, the court
11     reporter marked the exhibit as
12     Plaintiff's Exhibit-9).
13 BY MR. KELLY:
14     Q.  I will show you what has
15 been marked as Plaintiff's Exhibit-9.  Do you
16 recognize this document at all?
17     **A.  Yes.**
18     Q.  What is it?
19     **A.  A list from Mail2Media.**
20     Q.  It is a list of fax numbers
21 that appears to be a transmission report from
22 Mail2Media to Express Products identifying who
23 was sent a fax on February 27, 2002; is that
24 right?

101

1     **A.  Yes.**
2     Q.  Is that your writing on the
3 top?
4     **A.  Yes.**
5     Q.  It is also your writing,
6 2,258 faxes; is that right?
7     **A.  Yes.**
8     Q.  So, it is your understanding
9 that 2,258 faxes were sent on or about
10 February 27, 2002 to the companies listed on
11 Plaintiff's Exhibit-9?
12     **A.  I don't know if that's sent,**
13 **failed or both.**
14     Q.  But at least attempted
15 transmissions, correct?
16     **A.  Yes.**
17     Q.  My question to you is, the
18 faxes that were sent on or about February 27,
19 2002, were all of the fax numbers obtained by
20 the companies where the sales reps requested
21 the fax numbers in order to send out the
22 advertisements by fax?
23     **A.  Yes.**
24     Q.  Was it the custom and

DAN GEIGER

**102**

1  practice for the sales reps to document in the
2  comments section of ProBooks to show that the
3  companies had requested to receive
4  advertisements by fax?
5       **A.  No.**
6       Q.  Why not?
7       **A.  It was accepted if there was**
8  **a fax number, then it was okay.**
9       Q.  Do you have any documents
10  showing that any of the companies that
11  received the advertisements by fax show that
12  they had given permission to receive those
13  advertisements?
14       **A.  We have a few.**
15       Q.  Did you give those to your
16  attorney?
17       **A.  I am not sure.**
18       Q.  Have you ever reviewed all
19  the call logs for all the companies?
20       **A.  (Witness Nodding).**
21       Q.  No?
22       **A.  No.**
23       Q.  You just reviewed the call
24  logs for Business Pro and Direct

**103**

1  Communications, correct?
2       **A.  No.**
3       Q.  No?
4       **A.  No.**
5       Q.  No?
6       **A.  No. No.**
7       Q.  All right.  It is a double
8  negative.  Who else did you review?
9       **A.  Other customers.**
10       Q.  Just sporadically?
11       **A.  Yes.**
12       Q.  To see what the sales reps
13  did?
14       **A.  Yes.**
15       Q.  Based upon your review, did
16  you determine that the sales reps did not
17  document in the call logs specifically that
18  the companies wished to receive advertisements
19  by fax?
20       **A.  No.**
21       Q.  What did you see?
22       **A.  Some customers do request**
23  **it.**
24       Q.  Okay.

**104**

1       **A.  And some sales people do log**
2  **it in the log.**
3       Q.  How many did you find that
4  specifically requested to receive
5  advertisements by fax?
6       **A.  Few dozens.**
7       MR. KELLY:  Some additional
8  call logs were produced from your
9  attorney to my office.  I will
10  just request if you have any other
11  call logs in which the call log
12  identifies that the company
13  specifically requested to receive
14  advertisements by fax to give
15  those to your attorney.  I am
16  requesting those logs.  I will put
17  it in a letter.
18  BY MR KELLY:
19       Q.  Did you wait to collect a
20  bunch of fax numbers in order to do the
21  broadcast?
22       **A.  No.**
23       Q.  Did you ever send out any
24  advertisements by hand in-house without using

**105**

1  a broadcaster?
2       **A.  Yes.**
3       Q.  Was that done early on?
4       **A.  Yes.**
5       Q.  Am I correct in stating that
6  as soon as the spreadsheet got larger, then
7  you started using the broadcaster?
8       **A.  No.**
9       Q.  How am I incorrect on that?
10       **A.  You asked me before we**
11  **started when as a result of advertising from**
12  **Mail2Media.**
13       Q.  Was there ever a time that
14  you personally sent out faxes in which
15  companies had requested to receive the
16  advertisements by fax?
17       **A.  Yes.**
18       Q.  My question to you is you
19  used a broadcaster because it began to be a
20  lot of companies requesting to receive the
21  faxes; is that true?
22       MS. MESPLOU:  Objection.  It
23  is misstating his testimony.
24       MR. KELLY:  You can answer.

DAN GEIGER

106

1      THE WITNESS: It is more
2   convenient.
3   BY MR KELLY:
4      Q.   Right. Have you used any
5   other broadcaster other than Mail2Media?
6      A.  No.
7      Q.   Have you purchased any other
8   lists other than from Info USA?
9      A.  No.
10     MR. KELLY: Okay. That's
11  it.
12     MS. MESPLOU: I just have a
13  few.
14  BY MS. MESPLOU:
15     Q.   The fax list that Mail2Media
16  gratuitously sent you, do you remember
17  testifying about that?
18     MR. KELLY: I will object.
19  I don't think the term
20  gratuitously was ever used.
21     MS. MESPLOU: I will
22  rephrase the question.
23  BY MS. MESPLOU:
24     Q.   The fax list that Mail2Media

107

1   sent in conjunction with the email list on a
2   CD, do you remember testifying about that?
3      A.  Yes.
4      Q.   In your mind, was that fax
5   list free?
6      A.  Yes.
7      Q.   You were only charged for
8   the email list, correct?
9      A.  Yes.
10     Q.   You were not charged by
11  Mail2Media for the fax list?
12     A.  Right.
13     Q.   Did you ever send any faxes
14  to the numbers contained in that fax list?
15     A.  Never.
16     Q.   Did you ever use that fax
17  list in any way, shape or form?
18     A.  No.
19     Q.   Going back to the first
20  contact that a sales representative makes with
21  a customer.
22     MR. KELLY: With a company
23  or customer?
24     MS. MESPLOU: With a

108

1   company, potential customer. How
2   is that?
3      MR. KELLY: That is fine.
4   BY MS. MESPLOU:
5      Q.   You testified that they are
6   calling to try to sell that potential customer
7   products, correct?
8      A.  Correct.
9      Q.   At what point does that
10  potential customer get into ProBooks? Is it
11  any contact that's made or does it have to be
12  a certain type of contact that's made?
13     A.  It is not any contact,
14  because if the guy is not interested in
15  accessories, it will never make it to
16  ProBooks. If the salesman sees the
17  possibility of obtaining a customer, and he
18  wants to follow-up on it, then it enters in
19  ProBooks.
20     Q.   For the sales representative
21  to enter that potential customer into
22  ProBooks, the potential customer must first
23  express some interest in Express Products's
24  cell phone accessories?

109

1      A.  Yes.
2      Q.   For a fax number to get into
3   that potential customer or customer's profile,
4   that customer must provide it to the sales
5   representative; is that correct?
6      A.  Yes.
7      Q.   The, Info USA list that
8   Express Products purchased, what information
9   did those lists contain specifically?
10     A.  Company name, contact, phone
11  number, state and address.
12     Q.   Did those lists contain any
13  fax numbers?
14     A.  No.
15     Q.   Why is that?
16     A.  To obtain a fax number from
17  Info USA costs more, additional charge.
18     Q.   Did every contact from the
19  Info USA list make it into ProBooks?
20     A.  Every, I don't know.
21     Q.   If a contact did not make it
22  from the Info USA list into ProBooks, is that
23  because of the policy that a potential
24  customer only made it into ProBooks if they

DAN GEIGER

110

1 expressed an interest?
2    **A.   Yes.**
3        **And the list also contained**
4 **obsolete phone numbers too.**
5    Q.   What is your policy about a
6 sales representative informing potential
7 customers about receiving weekly specials?
8        MR. KELLY:  Just so we are
9        clear, are we talking about the
10        advertisements that have been sent
11        by fax?
12        MS. MESPLOU:  I am going to
13        get there.  I am going to get
14        there.
15 BY MS. MESPLOU:
16    Q.   You have weekly specials,
17 correct?
18    **A.   Correct.**
19    Q.   Between 2002, let's say,
20 2004, how were the weekly specials sent to
21 customers?
22    **A.   By fax.**
23    Q.   Were those only sent to
24 customers or potential customers who wanted to

111

1 receive weekly specials?
2    **A.   Yes.**
3    Q.   How did a sales
4 representative find out if a company,
5 potential customer, wanted to receive weekly
6 specials?
7    **A.   They asked them in the phone**
8 **call.**
9    Q.   What specifically did they
10 ask them?
11    **A.   If they want to see our**
12 **weekly specials.**
13    Q.   Was it made clear that
14 weekly specials were transmitted via fax?
15        MR. KELLY:  I will make an
16        objection as to him testifying as
17        to any of the telephone
18        conversations that the sales reps
19        may have had to the companies as
20        lack of foundation.
21 BY MS. MESPLOU:
22    Q.   As the president of Business
23 Pro, as the president of Express Products, did
24 you implement the policies followed by your

112

1 sales representatives in contacting potential
2 customers and customers in the ProBooks
3 database?
4    **A.   Yes.**
5    Q.   And those policies for
6 contacting people on the Info USA list?
7    **A.   Yes.**
8    Q.   As the president, you
9 implemented those policies, correct?
10    **A.   Yes.**
11    Q.   So, it was your policy that
12 a sales representative first find out if a
13 potential customer wanted to receive weekly
14 specials; is that correct?
15    **A.   Yes.**
16    Q.   Before those weekly specials
17 are sent out?
18    **A.   Yes.**
19    Q.   And it was your policy that
20 the sales representative convey that the
21 weekly specials are sent via fax?
22    **A.   Yes.**
23    Q.   And it was your policy that
24 the sales representative obtain the fax number

113

1 in order to send those weekly specials; is
2 that correct?
3    **A.   Right.**
4    Q.   I am going to now turn your
5 attention back to what has previously been
6 marked as Exhibits-7 and 8.
7        First, I want to draw your
8 attention to the top left-hand corner of
9 Exhibit-7.  Do you see a line there that says,
10 "IL9495780"?
11    **A.   Yes.**
12    Q.   What does that direct your
13 attention to?
14    **A.   Another customer.**
15    Q.   What customer does that
16 direct your attention to?
17    **A.   IL9495780.**
18    Q.   Looking at Exhibits-7 and 8,
19 do you know which customer is 949-5780?
20    **A.   Direct Communication.**
21    Q.   You testified earlier that
22 you recognize Exhibit-7 and 8 to be Express
23 Products call-logs for customers or potential
24 customers, correct?

DAN GEIGER

114

1      A.   Yes.
2      Q.   And you testified earlier
3  that you recognized Exhibit-7 to be a Business
4  Pro call-log because it says Business Pro
5  call-log on it, correct?
6      A.   Correct.
7      Q.   Just so we are clear, what
8  is Exhibit-8?
9      A.   It is a Direct
10 Communications call-log.
11     Q.   How do you know that?
12     A.   It says Direct
13 Communications.
14     Q.   And it also appears to be --
15     A.   And it is a printout from a
16 call-log from our computer.
17     Q.   And you know that because
18 you printed those out?
19     A.   Correct.
20     Q.   And I just want to be clear,
21 what are the call-logs used for within the
22 context of Express Products business?
23     A.   It is a record of calls and
24 the history of calls which also have some

116

1  sales people supposed to input the information
2  into call-logs?
3      A.   Straight away while they are
4  still on the phone or immediately after.
5      Q.   And this information is
6  saved in the customer's profile, memo portion
7  of their profile, correct?
8      A.   Correct.
9      Q.   And it is consistently
10 updated as more calls are made, correct?
11     A.   Correct.
12     Q.   This procedure that you have
13 described of inputting the information right
14 after the phone call is made and the type of
15 information that is input after a call is
16 made, that has been applied to all of Express
17 Products' customers, correct?
18     A.   Correct.
19     Q.   That was the policy in place
20 at the time referenced or the dates referenced
21 on Exhibits-7 and 8; is that correct?
22     A.   Correct.
23     Q.   To your knowledge, these
24 represent, based on your review of your

115

1  reference to the future callers.
2      Q.   And what kind of information
3  does a call-log for any customer or potential
4  customer contain?
5      A.   Any information the customer
6  says we can get.
7      Q.   Such as products they might
8  be interested in?
9      A.   Products, what phones
10 they're selling. This one indicated two
11 phones. The name of the guy. On some of them
12 you might even get the birthday of the guy.
13     Q.   The birthday?
14     A.   Yes.
15     Q.   So you could maybe send a
16 birthday card?
17     A.   Exactly.
18     Q.   And it is the sales
19 representatives who make the call that inputs
20 this information; is that correct?
21     A.   Correct.
22     Q.   Under the policies and
23 procedures that you have implemented as the
24 president of Express Products, when are the

117

1  records, and as the president of Express
2  Products, these represent full and complete
3  and accurate copies of the memos of phone logs
4  from Business Pro and Direct Communications?
5      A.   Correct.
6      Q.   So then looking at
7  Exhibit-8, which is Direct Communications, is
8  there any reference in that that you can see,
9  to Business Pro?
10     A.   Yes, "November '02 got
11 recording stating that I have reached Business
12 Pro Communication."
13     MR. KELLY:  Which date?
14     THE WITNESS:  November 12,
15 2002.
16 BY MS. MESPLOU:
17     Q.   Given that, and the
18 notations here, IL9495780, which is Direct
19 Communications, would you say that according
20 to Express Products's records these two
21 companies were considered the same for
22 purposes of Express Products sales calls?
23     A.   Yes.
24     Q.   Do you see anywhere on

DAN GEIGER

118

1  either Exhibits 7 or 8 that Express Products
2  sent samples?
3        A.    Yes.
4        Q.    Where do you see that?
5        A.    In Business Pro, Exhibit-7,
6  it says, "I am sending a sample for the I-1000
7  the car cord a catalog and business card with
8  leather clips."
9              And I saw just a few minutes
10 ago in Direct Communications saying that they
11 received it.
12             Yes, January 2, 2003 spoke
13 to Shawn and he said that he received all of
14 our info and specials from Don and myself and
15 he liked the samples.
16             So, he received them.
17       Q.    So, they got free stuff from
18 Express Products; is that correct?
19       A.    They're not the only ones.
20       Q.    But they received free
21 samples from you?
22       A.    Yes.
23       Q.    And they also acknowledged
24 -- or I am sorry, Shawn in that January 2,

120

1              recess was taken, at the
2              conclusion of which, the
3              deposition continued as follows):
4  BY MS. MESPLOU:
5        Q.    Back on the record.  Other
6  than the January 2, 2003 date, do you see any
7  other recordings where anyone from Direct
8  Communications or Business Pro Communications
9  wanted to receive specials?
10       A.    Other than which one?
11       Q.    Other than this one, other
12 than the January 2, 2003, do you see another
13 one where they wanted to receive specials?
14             MR. KELLY:  I'll just make
15       an objection as to what the state
16       of mind of the company that's
17       identified in the January 1, 2003
18       entry.
19             MS. MESPLOU: I will ask it
20       this way.
21 BY MS. MESPLOU:
22       Q.    Do you see the February 10,
23 2003 entry on Direct Communications?
24             MR. KELLY:  On Exhibit-8?

119

1  2003 conversation, acknowledged receiving info
2  and specials; is that correct?
3        A.    Correct.
4        Q.    And you testified earlier
5  that the info and specials was sent via fax?
6              MR. KELLY:  Wait. I'm
7        sorry, I did not get that
8        question.
9              MS. MESPLOU:  He testified
10       earlier that info and specials was
11       sent via fax.
12             THE WITNESS:  Fax, yes.
13 BY MS. MESPLOU:
14       Q.    There is no reference there
15 in that January 2, 2003 comment that he
16 doesn't want to receive info and specials; is
17 that correct?
18       A.    Correct.
19       Q.    Is that something that a
20 sales person would have input?
21       A.    Yes.
22             MS. MESPLOU:  Let's take a
23       break.
24             (At this point, a brief

121

1              MS. MESPLOU:  I'm sorry on
2        Exhibit-8.
3              THE WITNESS:  February 10th.
4        Right, yes.
5  BY MS. MESPLOU:
6        Q.    And you see there where the
7  sales representative indicated that Shawn,
8  "wants me to let him know if we run any
9  specials"; do you see that?
10       A.    Yes.
11       Q.    Under your policy, a
12 potential customer is informed of specials via
13 fax; is that correct?
14       A.    That's correct.
15       Q.    And to the best of your
16 knowledge, under your policies, customers know
17 that information regarding specials always
18 comes via faxes; is that correct?
19       A.    That's correct.
20             MS. MESPLOU:  I have nothing
21       further.  MR.
22             MR. KELLY:  Just a couple of
23       follow-ups.
24 BY MR. KELLY:

DAN GEIGER

122

1     Q.   Does the February 10, 2003
2  entry indicate whether or not Shawn knew that
3  the specials were to be received by fax?  Is
4  there anything in that entry that dates that?
5     **A.   In the entry?  No.**
6     Q.   Yes.
7     **A.   No.**
8     Q.   Who is Don, Don Lease, are
9  you familiar with that name?
10    **A.   Yes.**
11    Q.   Who is that?
12    **A.   Salesman.**
13    Q.   Does he currently work at
14 Express Products?
15    **A.   No.**
16    Q.   Have you spoken to him in
17 the last couple of years?
18    **A.   No.**
19    Q.   Do you know where he is?
20    **A.   No.**
21    Q.   Do you have a last known
22 address and phone number for him?
23    **A.   No, he left.**
24    Q.   Well?

123

1     **A.   He disappeared, put it this**
2  **way.**
3     Q.   Did he have trouble with the
4  law or?
5     **A.   Don't know.**
6     Q.   But do you have a last known
7  address and phone number for him in your
8  office?
9     **A.   Yes.**
10    Q.   The phone number of 949-5780
11 was the phone number that was called for all
12 of these entries, correct?
13    **A.   No.**
14    Q.   Why not?
15    **A.   Business Pro has a different**
16 **phone number.**
17    Q.   What is Business Pro's phone
18 number?
19    **A.   I don't know.**
20    Q.   I am kind of confused then.
21 When you --
22    MS. MESPLOU:  He's saying,
23    just looking at Exhibit-8, only
24    Exhibit-8, is 949-5780 the number

124

1     called for just the entries on
2     Exhibit-8?
3     THE WITNESS:  Yes.
4  BY MR. KELLY:
5     Q.   How about Exhibit-7, is the
6  phone number 949-5780 called for the entries
7  on Exhibit-7?
8     **A.   No.**
9     Q.   Which phone number was
10 called?
11    **A.   I don't know.**
12    Q.   Is there a way you can
13 determine that?
14    **A.   Only by looking at ProBooks.**
15    Q.   But you are certain that the
16 949-5780 used to call -- was not the
17 phone number associated with the entries on
18 Exhibit-7?
19    **A.   Correct.**
20    MS. MESPLOU:  And this is
21    all assuming that there is an area
22    code out there.  We are not just
23    talking the main phone number.
24    THE WITNESS:  Um-hum.

125

1  BY MR. KELLY:
2     Q.   Are the companies in
3  ProBooks organized by phone number or go by
4  companies -- let me ask a better question.
5     How are the companies arranged
6  for the sales reps, by phone number or by
7  company?
8     **A.   The database in ProBooks?**
9     Q.   Yes.
10    **A.   Every customer has an ID or**
11 **customer code.  The customer code consists of**
12 ~~the state and the phone number without the~~
13 **area code.  Then comes customer name.**
14 **Salesmen can look it up either way.**
15    Q.   So, Direct Communications
16 had a code, a ProBooks code, of IL9495780,
17 correct?
18    **A.   That's correct.**
19    Q.   Right?
20    **A.   Yes.**
21    Q.   That is not necessarily
22 Direct Communications's phone number that was
23 used to call; is that correct?
24    **A.   It is possible.**

DAN GEIGER

126

1    Q.    It is not necessarily the
2    number?
3    **A.    It is not necessarily.**
4    Q.    So am I also correct in
5    stating that, Exhibit-7, that the Business Pro
6    ID number is also IL9495780, or does it have a
7    different code?
8    **A.    No, different code.**
9    Q.    Do you know what the code
10   is?
11   **A.    No.**
12   Q.    How are these two documents
13   related or interrelated?  I am not quite sure
14   how these are related.
15   **A.    How the documents are**
16   **related?**
17   Q.    Right.
18   **A.    Or the companies are**
19   **related?**
20   Q.    Both.
21   **A.    Well, the companies are**
22   **related because of a reference from one to**
23   **another, and that's why in the call-logs of**
24   **Business Pro it says go and see Direct**

127

1    **Communications.  That's why you see IL949 --**
2    **In other words, go to customer IL9495780.**
3    Q.    Okay.
4    **A.    It is a replacement of the**
5    **successor or whatever of Business Pro.**
6    Q.    Do you know why ProBooks has
7    the entries being sent to or identified as
8    Direct Communications?
9           MS. MESPLOU:  Sorry.  Say
10          that again.
11   BY MR. KELLY:
12   Q.    Do you understand the
13   question?
14   **A.    No.**
15   Q.    Let me repeat or rephrase.
16   Was the Direct Communications company name
17   first put into ProBooks on September 3, 2002?
18   **A.    I don't know.  It is**
19   **possible.**
20   Q.    Does that sound reasonable?
21   **A.    Sounds reasonable, yes.**
22   Q.    The reason why there is a
23   new company is because the individual must
24   have said that he is with a different company;

128

1    is that correct?
2    **A.    The individual could have**
3    **said he is with a different company or the**
4    **company could have opened another location.**
5    Q.    How many different addresses
6    do you have for Business Pro?
7    **A.    I believe just one.**
8    Q.    Which address is that?
9    **A.    I don't remember.**
10   Q.    Do you know what town?
11   **A.    Illinois.**
12   Q.    That's not a town, that's a
13   state.
14   **A.    That's as far as I know.**
15   Q.    Would you be able to tell
16   what address you have for Business Pro?
17   **A.    Looking at the ProBooks,**
18   **yes.**
19   Q.    As you sit here today, you
20   believe there is just one address for Business
21   Pro?
22   **A.    Yes.**
23   Q.    How about Direct
24   Communications?

129

1    **A.    Yes, same.**
2    Q.    How many addresses?
3    **A.    I believe just one.**
4    Q.    Is it the same address that
5    Business Pro has?
6    **A.    I don't know.**
7           MS. MESPLOU:  I am going to
8           call it in five minutes.
9           MR. KELLY:  I am almost
10          done.
11   BY MR. KELLY:
12   Q.    How many different fax
13   numbers did ProBooks have for Business Pro?
14   **A.    I don't know.**
15   Q.    How many different fax
16   numbers did Direct Communications have on
17   ProBooks?
18   **A.    I don't know.**
19   Q.    The November 20, 2002, entry,
20   it says Don Lease sent samples back in
21   September.  Do you see that?
22   **A.    On Exhibit-8?**
23          MS. MESPLOU:  November 20,
24          2002?

DAN GEIGER

130

1    MR. KELLY:  Yes.  Do you see
2  that?
3    MS. MESPLOU:  Don Lease sent
4  samples.
5    THE WITNESS:  Yes.
6  BY MR. KELLY:
7    Q.  Can you determine what type
8  of samples were sent back in September?
9    A.  No.
10    Q.  You would agree with me that
11  the samples that were sent were via mail; is
12  that correct?
13    A.  UPS.
14    Q.  The entry January 2, 2003
15  says that spoke to Shawn and he said that he
16  received all of our info and specials.  Okay.
17  That's the next contact.  That entry refers to
18  the specials that were received back in
19  September by UPS mail; is that correct?
20    MS. MESPLOU:  No, the
21  samples, not specials.  It is
22  different.
23    MR. KELLY:  You can answer.
24    THE WITNESS:  Ask again.

131

1    MS. MESPLOU:  I am going to
2  object.  It misconstrues his
3  testimony.
4    MR. KELLY:  Let me ask it a
5  different way.
6  BY MR. KELLY:
7    Q.  Based upon your review of
8  January 2, 2003, was the info and specials
9  sent via UPS?
10    A.  Info and specials, no.
11  Samples, yes.
12    Q.  Are there any comments to
13  show that before January 2, 2003 that Shawn
14  requested any info or specials?
15    A.  9/02.
16    Q.  Which day?
17    MS. MESPLOU:  9/3.
18    THE WITNESS:  9/3/02 Shawn
19  told me to send him a catalog.
20  BY MR. KELLY:
21    Q.  That catalog was sent via
22  UPS, correct?
23    A.  No, it just says a catalog.
24  It will be sent via mail.

132

1    Q.  Not fax, correct?
2    A.  Correct.
3    Q.  So, my question is, are
4  there any entries prior to January 2, 2003
5  where Shawn requested any info or specials to
6  be received by fax?
7    A.  Specifically by fax, no.
8    Q.  The February 10, 2003 entry,
9  does Shawn indicate how Express Products or
10  the sales rep, how they were to inform Shawn
11  of any specials that could be by a follow-up
12  phone call; isn't that correct?
13    MS. MESPLOU:  I am going to
14  object to the form of the
15  question.
16    MR. KELLY:  Let me ask --
17    MS. MESPLOU:  This is your
18  last question.  Make it a good
19  one.
20    MR. KELLY:  I have got three
21  minutes.  No more than ten
22  questions.  How is that?
23    MS. MESPLOU:  Five.
24    MR. KELLY:  All right.

133

1  BY MR. KELLY:
2    Q.  Am I correct in stating that
3  nowhere in the entries does it indicate how
4  Shawn wanted Express Products to inform him of
5  the specials; is that correct?
6    A.  Correct.
7    Q.  And that Shawn could have
8  wanted the specials to be communicated via a
9  follow-up telephone conversation, correct?
10    A.  Not correct.
11    Q.  All right.
12    MR. KELLY:  Those are all
13  the questions I have.
14    Thanks.
15    MS. MESPLOU:  Thank you.
16    (Witness excused).
17    (Deposition concluded at
18  12:55 p.m.)
19
20
21
22
23
24