Page 2

1
2  APPEARANCES:
3
4    Anderson + Wanca
5    RYAN M. KELLY
6    3701 Algonquin Road
7    Suite 760
8    Rolling Meadows, Illinois  60008
9        Appearing on behalf of the Plaintiff
10
11   LaBarge, Campbell & Lyon, LLC
12   KEVIN CAMPBELL
13   200 West Jackson Boulevard
14   Suite 2050
15   Chicago, Illinois  60606
16       Appearing on behalf of the Defendant

Page 3

                    INDEX

ROBERT DEMYANOVICH                              Page
  Examination by Mr. Kelly                        4
  Examination by Mr. Campbell                    67
  Further Examination by Mr. Kelly               69


                EXHIBIT INDEX
Exhibit                                         Page
  Deposition Exhibit No. 1                       70
  Deposition Exhibit No. 2                       70
  Deposition Exhibit No. 3                       70
  Deposition Exhibit No. 5                       70
  Deposition Exhibit No. 10                      70

Page 4

1         Bloomfield Hills, Michigan
2         Tuesday, January 30, 2007
3              2:00 o'clock p.m.
4     VIDEOGRAPHER: This is the video tape deposition
5  of Robert Demyanovich being taken in Bloomfield Hills,
6  Michigan. Today is January 30th, 2007; the time is
7  2:07 and 22 seconds p.m.
8     Will the attorneys please introduce themselves,
9  and the court reporter, please swear in the witness.
10    MR. KELLY: My name is Ryan Kelly, and I
11 represent the Plaintiff, Business Pro Communications.
12    MR. CAMPBELL: My name is Kevin Campbell on
13 behalf of the Defendant, Express Products.
14        R O B E R T  D E M Y A N O V I C H
15 having first been duly sworn, was examined and
16 testified on his oath as follows:
17              *   *   *
18 EXAMINATION BY MR. KELLY:
19 Q. Can you state your name and spell your last name for
20    the record, please?
21 A. Robert Demyanovich, D-E-M-Y-A-N-O-V-I-C-H.
22 Q. Mr. Demyanovich, are you currently employed?
23 A. Yes, I am.
24 Q. By whom?
25 A. Mail2Media.

Page 5

1  Q. Where is Mail2Media located?
2  A. 4926 Delemere Avenue, Royal Oak, Michigan, 48073.
3  Q. How long has Mail2Media been at the Delemere address?
4  A. Our current address, we've been there for a little
5     over two years.
6  Q. Where did Mail2Media operate prior?
7  A. We operated in the same town of Royal Oak, Michigan,
8     but at 4248, I believe, Delemere Court, Royal Oak,
9     Michigan.
10 Q. Okay. How long did you operate out of that location?
11 A. Oh, about three years.
12 Q. Did Mail2Media have a prior location?
13 A. Prior to that, yes. We were in the City of Troy,
14    Michigan on Bellingham Avenue in Troy.
15 Q. Was that the first office location that you had with
16    Mail2Media?
17 A. No. As we grew, each year we moved, as we grew, we
18    originally started the company in the City of St.
19    Clair Shores, Michigan.
20 Q. When was Mail2Media started?
21 A. 1999. January 1st, 1999.
22 Q. Okay. And Mail2Media is incorporated under the laws
23    of Michigan?
24 A. The State of Michigan, yes.
25 Q. When did Mail2Media move to the Troy, Michigan

Page 6

1  location?
2  A. Probably in the year 2000. Again, just as of memory,
3     I would believe about the year 2000.
4  Q. What does Mail2Media do?
5  A. Mail2Media is a communications company that helps its
6     customers better communicate by direct mail, facsimile
7     broadcasting, and e-mail broadcasting.
8  Q. Has Mail2Media always been in the business of
9     providing communications to its customers?
10 A. Yes, we have.
11 Q. Does Mail2Media have a website address?
12 A. Yes, we do.
13 Q. What is that?
14 A. Www.mail2media.com.
15 Q. How long has Mail2Media had that website address?
16 A. I believe since the beginning of our company.
17 Q. Have you always been the owner of Mail2Media?
18 A. Yes.
19 Q. And have you always been a full-time worker at
20    Mail2Media?
21 A. Yes.
22 Q. Does full-time mean approximately 9:00 to 5:00 every
23    day, Monday through Friday?
24 A. You must be talking about a vacation. No, it's
25    normally a 60, 70, 80 hour week.

Page 7

1  Q. Okay. And you are the person who makes the business
2     decisions at Mail2Media?
3  A. I'm the President of Mail2Media so I make the final
4     decisions.
5  Q. How does Mail2Media generate business?
6  A. We have clients who are nationwide and internationally
7     who might come to our website looking for direct mail
8     marketing and printing and mailing, or fax
9     broadcasting, or e-mail broadcasting. They'll look
10    for a solution to help them better communicate more
11    efficiently.
12 Q. Does Mail2Media do any radio advertising or anything
13    like that to generate customers?
14 A. We do not do any kind of radio or print media
15    advertising; however, we do do telemarketing calls
16    from sales and we do our own messaging by e-mail or by
17    direct mail to solicit new business.
18 Q. In this case, do you know how Express Products first
19    came into contact with Mail2Media?
20 A. Again, I don't know how, exactly, they became a
21    customer. All I know is, it could have been through a
22    sales call from one of our sales representatives at
23    the time, or it could have been through a marketing
24    piece that we sent to them, or it even could be
25    through a referral from another customer to us.

Page 8

1  Q. And it also could have been Express Products searching
2     the web and finding Mail2Media as a broadcast?
3     MR. CAMPBELL: I'll just object, leading and
4     speculation.
5  Q. (BY MR. KELLY): You can answer.
6  A. The -- what would happen is, we're on the internet,
7     and as any company being on the internet, you can put
8     in key words to find us, whether it be direct mail,
9     whether it be e-mail, or whether it even be facsimile.
10    You'll find us and everybody else that's on the
11    internet.
12 Q. However, as you sit here today, you don't know how
13    Express Products first came into contact with you,
14    correct?
15 A. No, I don't know.
16 Q. Did you know Mr. Dan Geiger or anybody from Express
17    Products prior to 2002?
18 A. No. The only relationship we have with Dan Geiger is
19    as a customer.
20 Q. And Mail2Media had a website address in 2002, is that
21    correct?
22 A. That is correct.
23 Q. Can you explain a little bit about the services that
24    Mail2Media offers with respect to fax broadcasting?
25 A. Well, what we do for our customers that uses fax

Page 9

1     broadcasting, we'll take a message that they create,
2     we will -- they'll send that to us through our website
3     by uploading that data to us or they'll -- along with
4     a list of fax numbers, names, and companies that they
5     wish to send that message to, and basically we'll take
6     that message and that list, merge it together through
7     our proprietary programs and send that out to them as
8     a sample for their approval. And once it's approved,
9     we will then send that transmission out as a fax
10    broadcast to people on their list.
11 Q. In this case, Express Products used Mail2Media
12    exclusively for fax broadcasting, is that right?
13 A. They used -- I don't know if they exclusively just
14    used us, Mail2Media, but I know that that's the only
15    service, I believe, that they utilized with us.
16 Q. And the service is fax broadcasting?
17 A. No, I take that back, I want to correct myself. There
18    was -- my recollection, Express Products did use a
19    postcard mailing with us, so they did direct mail
20    services with us. They also, I believe, did an e-mail
21    processing with us. So, the majority of what they did
22    with us was facsimile broadcasting, but they did
23    utilize our other -- those two other services.
24    MR. CAMPBELL: I'll just object, move to strike
25    on relevance and Rule 213.

Page 10

1  Q. (BY MR. KELLY): Mr. Demyanovich, can you take me
2  through the steps that a customer would need to do in
3  order to implement a broadcast, a fax broadcast?
4  A. A client, a new client would contact us either by
5  contacting us in sales, or our help desk, or go onto
6  the website and open up an account with us to start
7  the process of becoming a Mail2Media user. How far do
8  you want me to go?
9  Q. Further. Let me ask you a question, though. Once a
10 potential customer would view the Mail2Media website
11 address, what would the website ask of the potential
12 customer?
13 A. Well, when they first would go to the website it gives
14 a lot of background information on Mail2Media, the
15 products and services that we offer, and some detail
16 about that.
17    If there is a -- on the website there is a link
18 that says, would you like to open an account. They
19 would click on that link, and then it would go into a
20 secure page, which then would ask them to continue
21 opening up their account. It would ask them, whoever
22 it is, it would ask for an account number or a phone
23 number, which is your account number with us.
24    It would ask pertinent information, name,
25 address, city, state, zip code, phone number, contact

Page 11

1  information if we have a question.
2     It would also then show our terms and conditions
3  page, and by accepting beyond that page they accept
4  our terms and conditions.
5     After that step, they have to place money in
6  their account. They would then see a variety of
7  buttons allowing them to put as much money as they
8  deem necessary into their account.
9  Q. How many different ways is there to put money into an
10 account?
11 A. There's only one -- well, there's two ways. If you're
12 on the internet, you do it within your account. Or,
13 you can call your customer service rep. or our
14 accounting department and request funds to be placed
15 in your account, but, you would have to send us an e-
16 mail with that request.
17 Q. In this case, Express Products deposited money through
18 the website, is that right?
19 A. In the beginning, I would say yes. I couldn't tell
20 you how they did it -- because they were an account
21 for a number of years, how they did it further, but
22 they would start, everyone would have to start that
23 way.
24 Q. When is the customer given a log-in I.D.?
25 A. At the time they create their account, when they place

Page 12

1  their funds, it then would ask them for credit card
2  information, it would ask them for -- it would give
3  them an invoice for them to print, it would confirm
4  that that account number is not being used by anyone
5  else.
6     After the completion of that process, it would
7  immediately issue a user name and password by e-mail
8  to their e-mail address.
9  Q. Does the credit card information then get stored on
10 the website address for future use?
11 A. The -- we do not store any credit card information on
12 our websites. It would then go to -- that information
13 is given to the accounting department, it is stored in
14 our accounting department for future use.
15 Q. If a customer needed to replenish the account, would
16 they need to put in a credit card number?
17 A. If they were utilizing their on-line system, the
18 answer is yes, they would have to put in their
19 information all over again, their credit card
20 information, address, et cetera.
21 Q. Could a customer call in to Mail2Media to request a
22 broadcast or was that done specifically through the
23 website address?
24 A. They could if they were a repetitive user, someone
25 that we knew who they were by use. And then we would

Page 13

1  always ask them to send their messaging through their
2  e-mail. So, it would never be where you could dictate
3  a message or send it. It would be something where you
4  would have to send us the message, but you could
5  bypass the on-line system and send it directly by
6  e-mail to the operations department.
7  Q. In this case, did Express Products use the website
8  address to conduct the fax broadcasts?
9  A. I believe they did both, over the time. To my
10 recollection, I believe they used both.
11 Q. So, is it your testimony that Express Products sent
12 the advertisements by e-mail to Mail2Media?
13    MR. CAMPBELL: I'm going to object, leading and
14 foundation.
15 A. When I say both, they've used the on-line system to
16 upload messages; and if they sent it through e-mail,
17 which I believe they did, they would have to attach a
18 message and a list to be sent to us.
19 Q. (BY MR. KELLY): My office issued a subpoena to
20 Mail2Media, is that correct?
21 A. That is correct.
22 Q. And you responded to the subpoena with responsive
23 documents, is that right?
24 A. That is correct.
25 Q. All right.

**Page 14**

1 Q. I'm showing you what's been marked as Plaintiff's
2    Exhibit No. 1. I'm going to ask you to take a look at
3    those documents.
4        MR. CAMPBELL: Just for the record, I'll object
5    to Plaintiff's group Exhibit No. 1 to the extent that
6    it contains any information not directly related to or
7    relevant to the three faxes that are currently the
8    subject of the lawsuit.
9        MR. KELLY: And you can have a standing objection
10   to that.
11 Q. (BY MR. KELLY): Does Plaintiff's Exhibit 1 appear to
12   be a full and complete list of the invoices that you
13   produced to my office, pursuant to the subpoena?
14 A. Yes.
15 Q. Did you produce any e-mails that either went to or
16   came from Express Products?
17 A. Under Exhibit No. 1?
18 Q. No, any documents.
19 A. Again, to my recollection, I believe there was some
20   correspondence that we provided.
21       MR. CAMPBELL: Same objections.
22 Q. (BY MR. KELLY): When a company wants to use
23   Mail2Media to send out faxes, does the website address
24   allow the company to choose when the faxes are to be
25   sent?

**Page 15**

1 A. Yes.
2 Q. How is that displayed?
3 A. Within your on-line account, there is a drop down menu
4    of communications products. Within the communications
5    products drop down menu there are different speeds of
6    delivery for a facsimile, along with all of our other
7    products and services, whether it be direct mail or
8    e-mail processing.
9 Q. Okay. What are the different choices that Mail2Media
10   offers?
11 A. There is facsimile immediate delivery, there is a
12   facsimile business day delivery, and there is a
13   facsimile off-peak delivery, and there is a facsimile
14   weekend off-peak delivery.
15 Q. Do those four choices price differently?
16 A. Yes, they do.
17 Q. Can you describe what would cost more?
18 A. The immediate would cost more because it's delivered
19   immediately.
20 Q. Okay.
21 A. Business day would be the next level -- as I said
22   them, business day would be next, off-peak would be
23   next, and then weekend off-peak would be the last.
24 Q. In this case, are you able to determine what choice
25   Express Products used to send out the faxes?

**Page 16**

1       MR. CAMPBELL: Objection, relevance and
2    foundation.
3 Q. (BY MR. KELLY): You can answer.
4 A. I believe that, to my recollection, Express Products
5    utilized off-peak facsimile delivery.
6 Q. Is there a contract that is signed before a company
7    can use Mail2Media?
8 A. No. They have the acceptance of our terms and
9    conditions on-line is the acceptance of our agreement.
10 Q. How does the company know how much they're paying to
11   transmit the faxes?
12 A. Normally, a client who utilizes us will call prior and
13   speak to customer service or a sales representative
14   and ask what prices for a quote on their project, and
15   they would be given the prices at that time. And
16   then, odds are, again, our norm would be that we would
17   send an e-mail to them with the prices, instructing
18   them if they wish to utilize our services, they would
19   have to go to our website to open up an account.
20 Q. In this case, are you able to determine how much
21   Express Products paid for sending the faxes?
22       MR. CAMPBELL: Objection, relevance and
23   foundation.
24 A. Again, our prices haven't changed too much over the
25   years, so I can tell you that for an off-peak

**Page 17**

1    facsimile it would have been 4-1/2 cents per minute.
2 Q. Okay. Now, you talk about per minute. Let me ask you
3    this, that doesn't mean 4 cents per successful
4    transmission, correct?
5 A. Not for -- it's different.
6 Q. Can you explain to me what per minute means?
7 A. When you send a fax message out, and it's all based on
8    the receiving fax machine. As technology changes
9    there are better fax machines today than there were
10   five years ago, so when you send a message out, and it
11   depends on the body of the message you're sending, it
12   could take a minute to be delivered to a fax machine,
13   it could take three minutes to be sent to a fax
14   machine depending on the age of the fax machine.
15      So, what we do is we base it on a per minute rate
16   so we can, in turn -- because we get reports that show
17   us how long a fax will take to get delivery to each of
18   the locations its delivered to. And, then, basically,
19   we have a program that averages it out and allows us
20   to know what the length of the average fax message
21   was.
22 Q. So, if a fax was not successfully received by the
23   recipient, the customer would still be charged for the
24   attempted transmission based upon how long it
25   attempted to get transmitted, is that right?

Page 18

1   MR. CAMPBELL: Objection, leading.
2 A. In our industry and over the years, our programs have
3   changed. In the beginning, we would charge only for
4   successful faxes, as telecom companies charge us to
5   deliver a fax message. Then we went to delivering --
6   charging for both successful and failed fax messages.
7   You do not charge for a busy because a busy is not
8   getting delivered.
9     So, as the years have progressed and our industry
10  has progressed, the norm today is you charge them for
11  all the messages that they sent.
12 Q. (BY MR. KELLY): Are you able to determine how Express
13  Products was charged for the fax broadcasts?
14   MR. CAMPBELL: Objection, relevance and
15  foundation.
16 A. In 2002, when they started their account, based on
17  Exhibit 1, I would believe that they were charged just
18  for the successes and not for the failures, but I
19  would have to look at their logs to see that that's
20  accurate or not.
21 Q. (BY MR. KELLY): Okay. When you say _successes_ are
22  you referring to -- the cost wouldn't be the
23  successful transmission, but the successful
24  transmission time it took for the transmission, is
25  that accurate?

Page 19

1   MR. CAMPBELL: Objection, leading and relevance.
2 A. It would be for the successful delivery of a fax.
3 Q. (BY MR. KELLY): Okay. So, a successful delivery
4   could vary, though, it could take a shorter period of
5   time and a longer period of time?
6 A. That is correct.
7   MR. CAMPBELL: Objection, leading.
8 Q. (BY MR. KELLY): When a company was ready to -- strike
9   that -- when a company was ready for a fax broadcast
10  to be handled by Mail2Media, what are the various
11  steps the company needs to give you in order to
12  conduct that broadcast?
13 A. When a customer would send their text and their
14  message into Mail2Media, we would send them a sample
15  by facsimile asking them for their approval. The
16  customer then would receive that fax broadcast and
17  look at it, make sure the quality is what they want,
18  and initial it, date it, sign it, whatever, and fax it
19  back to us so we would have approval to release their
20  message.
21 Q. Okay. Would Mail2Media ever conduct a broadcast
22  without first obtaining the signed approval from the
23  company?
24 A. No.
25 Q. In this case, did Express Products always sign or

Page 20

1   initial the faxes before Mail2Media would conduct a
2   broadcast?
3    MR. CAMPBELL: Objection, leading and foundation.
4 A. Not having all of them here, I would have to say I
5   believe that they did sign off and send it back to us
6   or we would not have released their message.
7 Q. (BY MR. KELLY): Why wouldn't you release the message
8   without first getting a signed authorization or
9   signature from the company?
10 A. Experience tells us, shows us, that quality of a
11  message, especially when you're dealing with graphics,
12  does not appear exactly the way a client originally
13  created that document. By sending them a fax message
14  like they would to their list, the quality is shown
15  exactly as it's going to appear.
16   So, if they like the quality of the message or
17  they can read the word verbiage and see the graphics,
18  we, in turn, ask them to sign it and fax it back.
19  Otherwise, if we just released it on our own, a client
20  could say, I didn't like the quality of the message,
21  thusly I don't want to pay for the message that you
22  sent out. This eliminates that step from ever
23  happening.
24 Q. When a company requests a broadcast and uploads the
25  text file, does the fax automatically get sent to the

Page 21

1   company's fax machine or is it done manually?
2 A. It's done automatically based on the information
3   that's provided in their on-line account. The fax
4   number they entered, or they can change at any time,
5   which is in their on-line account, allows the system
6   to send it directly to them.
7 Q. Okay. So, if a company requests a broadcast, in your
8   experience, how long would it then take for that
9   particular fax to then go to the company in order to
10  view it?
11 A. For approval?
12 Q. For approval.
13 A. They would be within five minutes.
14 Q. When a company would approve the fax and then fax it
15  back to Mail2Media authorizing Mail2Media to conduct a
16  broadcast, is the broadcast done automatically or is
17  it done manually?
18 A. Well, a computer operator would have to initiate the
19  project to go through our system. So, once they see
20  the -- our signed approval, they would attach it to
21  the work order and then push a number of keys and the
22  project would start to go.
23 Q. Can you explain how a broadcast would occur on your
24  end after approval from the company?
25 A. The list is -- again, the list a client provided is

Page 22

1  looked at, prepared to make sure it's in the accurate
2  format that our system needs it to be in. It then is
3  married, based on -- it's like an airport, let me say
4  it that way. You always have projects coming in and
5  out, so you have to look at the time of the day that
6  the project was sent in, you have to look at the speed
7  of delivery that client is asking for, an operator
8  then makes a decision as to what systems to place it
9  on within our computer system, and then to make sure
10 it gets delivered within the timeframe that that
11 client requested.
12 Q. Okay. Now, the Mail2Media operator doesn't stand next
13    to a fax machine and send out bulk faxes, is that
14    accurate?
15 A. No, it's done all by computers.
16 Q. Can you explain to me how it's done by computers?
17 A. A computer has programs, proprietary programs that
18    join a message and a list. It is then -- that
19    computer has, whether digital or analog, telephone
20    lines attached to it. There are, then, fax's similar
21    to a machine, walking to a machine, the machine would
22    automatically dial a number and see if it can connect
23    to that fax machine. And if it does connect, it sends
24    that fax message. If it doesn't, it looks in the
25    queue for the next available fax number, and then

Page 23

1  sends out the next message. It's a computerized
2  process, it's not done by human intervention.
3  Q. So, the data that that would be retrieved from the
4     broadcast, that would be automatically done by the
5     proprietary software, correct?
6  A. Yes.
7  Q. That data is accurate, correct?
8  A. That data is 100 percent accurate.
9  Q. And the data, is that correct, is also 100 percent
10    trustworthy?
11 A. Yes.
12 Q. There is no human error in that data?
13 A. No.
14 Q. Okay. When a broadcast is completed, how does
15    Mail2Media know that?
16 A. In each of our computer systems, it's like a phone
17    book, you have to -- it shows you how many records are
18    in a phone book, who the client is, and then it will
19    show us that it is finished, meaning there will be
20    zero records left to send.
21       After a project is done, we will get success logs
22    and failure logs. Success and failure logs represent
23    the successful faxes that got delivered and how long
24    it took to get delivered, and the failure logs
25    represent the ones that didn't get delivered and

Page 24

1  hopefully why they didn't get delivered.
2  Q. How soon after the end of the broadcast does that data
3     come to Mail2Media?
4  A. The data is there immediately, but we have to upload
5     that data to the client's proper account, and that
6     could take anywhere from five minutes to ten hours
7     depending on the backlog of the operator.
8  Q. What program actually creates the data showing the
9     success logs and the failure logs, is it the
10    proprietary software?
11 A. For our system, meaning for our client to view them,
12    is a proprietary program. To creation of the logs or
13    the success and failure logs, are done through the fax
14    programs that we have, which are not proprietary
15    tools.
16 Q. When you send the list for each particular broadcast,
17    how is the data sent, in what format?
18 A. It is sent -- well, again, it's a proprietary format
19    for viewing, but our clients can download that data.
20    And when they download it, it's in a comma delimited
21    file.
22 Q. Can a customer give Mail2Media the information in an
23    Excel spreadsheet?
24 A. Yes.
25 Q. And how does Mail2Media then transfer the data from

Page 25

1  the Excel spreadsheet to common separated values or
2  common --
3  A. Delimited.
4  Q. -- delimited values?
5  A. A computer operator will have to open the file if it's
6     in Excel, compared to a C.S.V., or a comma separated
7     file, open it, which they would do normally no matter
8     what format it was, open the file and just look at
9     making sure the fields are there that we need.
10       We also clean the file. When I say clean, we
11    remove all punctuation in a fax number, no
12    parentheses, no dashes, no dots. It's just a straight
13    ten-digit number. We clean that through another
14    program, and then we save that file as a comma
15    delimited file.
16 Q. When you save it as a comma delimited file, is that
17    done automatically?
18 A. Yes.
19 Q. Okay. What type of information can a company send you
20    with respect to the list that they're giving you; what
21    kind of information on the Excel spreadsheet or C.S.V.
22    files that they can give you?
23 A. Clients have sent as much information as they want.
24    It could be a street address, city, state, and zip
25    code. It could be account numbers of their clients,

### Page 26

1  it could be e-mail addresses, not just the fax number,
2  name, company. Some only send a fax number, some send
3  company and a fax number, it varies.
4  Q. Does that information appear on the header of the fax?
5  A. If the client provided a header, yes. If not, then we
6  have to figure it out.
7  Q. Okay. Each particular company can choose what they
8  want on the header?
9  A. Yes.
10 Q. And they can choose that, go into the website and
11 putting in information; how does that work?
12 A. When a client opened up his account, or her account,
13 they are asked that question, what do you want your
14 _from_ to appear on your fax. And a client will put
15 in -- normally, they'll put in their company name to
16 appear on there. Others -- some don't -- don't --
17 will put nothing in.
18    However, with the law changes over the years,
19 you're required to put something there. So, we have
20 to correct them and say you have to put your company
21 name in there.
22 Q. Is there also a designation for a to, T-O, colon?
23 A. Yes. There's a _to_ meaning -- those are only three
24 fields. There could be a to, a name, a company, and a
25 fax number.

### Page 27

1  Q. And is there then another field that allows for the
2  fax number?
3  A. Well, the name, the _to,_ the way it would work is on
4  the left side of a fax would be your from. The center
5  portion of your top fax line would be your _to,_ your
6  company, your name, your fax number. And on the
7  right-hand side of the fax would be the date and time.
8  Q. That information is something that the company
9  provides, that's not what Mail2Media does, correct?
10 A. Well, we provide the date, the time. The _from_ is
11 provided by the company. And the _to,_ company, and
12 fax number are also provided by the sender in their
13 database.
14 Q. Before Mail2Media would conduct a broadcast, is it
15 your practice to first get paid by the company?
16 A. A client has to have money in their on-line account
17 before we send out a fax broadcast.
18 Q. So, in other words, if the company didn't have enough
19 money in the account, the broadcast would not occur,
20 is that true?
21 A. It wouldn't be released until a client puts sufficient
22 funds in their account.
23 Q. In this case, did Express Products pay Mail2Media for
24 the broadcast that Mail2Media did?
25 A. Yes.

### Page 28

1     MR. CAMPBELL: I'll just object to the extent
2  that that calls for any information other than the
3  faxes that were sent to -- or allegedly sent to the
4  Plaintiff in this case.
5  Q. (BY MR. KELLY): And if you take a look at Plaintiff's
6  Exhibit 1, are you able to determine how Express
7  Products paid for the transmission?
8  A. Based on our invoicing of Exhibit 1, they paid by
9  credit card by placing a certain amount of money in
10 their  on-line account.
11 Q. Plaintiff's Exhibit 1 appear to be invoices sent to
12 Express Products, is that right?
13 A. That is correct.
14 Q. If you take a look at the first page on Plaintiff's
15 Exhibit 1, there's an invoice number. Are you
16 familiar with invoice numbers?
17 A. Yes, I am.
18 Q. Can you describe to me what that number means?
19 A. Our invoice system represents it's a -- the first two
20 digits represent the month; the next four digits
21 represent the year, the full year; the dash -- the
22 next three digits represent the invoice number at the
23 time of billing.
24 Q. What does _GMS_ number mean?
25 A. Global Messaging Software, that's what we call our

### Page 29

1  proprietary software, number, that's their account
2  number.
3  Q. Okay. And is that also -- it appears to be the fax
4  number that was given to you by Express Products?
5  A. Sometimes it's a fax number, sometimes it's a
6  customer's telephone number. Normally, it's a
7  telephone number of the customer.
8  Q. You were the person at Mail2Media to respond to the
9  subpoena in this case?
10 A. Yes, I was.
11 Q. And you personally retrieved all of the invoices
12 created or generated from the services performed for
13 Express Products, is that right?
14 A. That is correct.
15 Q. How were you able to retrieve the invoices from
16 Express Products, what did you personally do?
17 A. A client has a folder, a customer folder in our
18 accounting area, and every time they place money in
19 their account an invoice is created and a copy of that
20 invoice is placed inside their folder.
21 Q. How are the folders arranged, by company name?
22 A. Company name, yes.
23 Q. So, did you look to see or did you retrieve the
24 invoices that were in the Express Products folder?
25 A. Yes.

Page 30

1 Q. Are invoices created in response to a particular fax
2 broadcast?
3 A. No. They're created based on a client putting money
4 or authorizing money to be placed in their account.
5 Q. When a company would place money in their account, how
6 would the invoice be created, automatically?
7 A. No. The system would show that they placed money in
8 their account, we would get a notification report, and
9 then an invoice is created by the accounting
10 department.
11 Q. Okay. So, the accounting department would print out
12 the invoice?
13 A. That's correct.
14 Q. And is it the policy and practice of the accounting
15 department to print out all the invoices from
16 companies that have placed money in their accounts?
17 A. On that particular day, yes.
18 Q. The invoices that are identified in Plaintiff's
19 Exhibit 1 are invoices that were created at or near
20 the time Express Products placed money into their
21 account, is that correct?
22 A. That is correct.
23 Q. And the invoices identified in Plaintiff's Exhibit 1
24 are business records of Mail2Media, is that right?
25 A. That is correct.

Page 31

1 Q. Okay. And does Plaintiff's Exhibit 1 identify all of
2 the times in which Express Products placed money in
3 their account?
4 A. I would say yes, based on the last one being October,
5 2004.
6 Q. Can you take a look at Plaintiff's Exhibit 1, the
7 pages aren't numbered, but it would be an invoice date
8 of December 16th, 2003, do you see that?
9 A. Yes, I do.
10 Q. What does this invoice show?
11    MR. CAMPBELL: I'm just going to object as to
12 relevancy and foundation.
13 A. This invoice shows an invoice for $4,000 for the
14 acquiring of 100,000 facsimile minutes starting
15 January 1st, 2004.
16 Q. (BY MR. KELLY): Are you able to determine whether the
17 100,000 minutes are for successful transmissions or
18 failure transmissions?
19    MR. CAMPBELL: Same objection.
20 A. They would be for both.
21 Q. (BY MR. KELLY): Okay. Are you able to determine how
22 the $4,000 was paid?
23    MR. CAMPBELL: Same objection.
24 A. It doesn't say on the invoice by credit card, so I
25 would guesstimate that it was paid by check.

Page 32

1 Q. (BY MR. KELLY): Is there a reason why the GMS number
2 is 6088259556, which appears to be different from the
3 other GMS numbers?
4 A. That looks like a typo that was on that invoice. We
5 use templates, so it looks like it was just a typo.
6 Q. Okay. The last page of Plaintiff's Exhibit 1 doesn't
7 appear to be an invoice, can you explain what this
8 document is?
9 A. This is the summary sheet that every account gets when
10 they create an on-line account with Mail2Media. This
11 is the page where you can place an order for faxing,
12 where you can view your fax logs and previous jobs,
13 where you can add more funds, where you can get from
14 the filing cabinet help on how to process a job, and
15 it will show you your last transaction that you did
16 and it's just basically like a bank statement that
17 shows you what you've done.
18 Q. Okay. Now, it says here, the document shows that
19 there's a date of December 14th, 2004, it appears to
20 be a fax broadcast with a business day. Is that the
21 last date of the transmissions?
22    MR. CAMPBELL: I'll just object on relevance and
23 foundation and leading.
24 A. Based on that report, that would show that that was
25 the last project that was placed by this client,

Page 33

1 Express Products, for 1,703 fax messages.
2 Q. (BY MR. KELLY): What's a project, what is that --
3 A. Processing. A message and a list were provided to be
4 sent out as a fax message.
5 Q. Are you able to determine whether or not that project
6 was actually transmitted?
7    MR. CAMPBELL: Same objection as to foundation.
8 A. It wouldn't appear -- it would not have appeared on
9 this particular summary page if it wasn't completed.
10 And if you look into the view my fax e-mail logs, you
11 would have saw your success and failure logs for that
12 particular project.
13 Q. (BY MR. KELLY): Okay. So, did the broadcast occur?
14 A. Yes.
15 Q. How much does Express Products -- how much is in
16 Express Products' account?
17 A. At this point in time --
18    MR. CAMPBELL: Object in its relevance and
19 leading, foundation.
20 A. At this particular time, $85.15.
21 Q. (BY MR. KELLY): When you say _at this particular
22 time,_ are you referring to --
23 A. 12/14/04, the date.
24 Q. Okay. The last page of Plaintiff's Exhibit 1, that
25 was printed out on March 29th, 2006?

Page 34

1  A. That is correct.
2  Q. How much money was in Express Products account at that
3     time?
4  A. Zero balance.
5  Q. So, is it accurate to say that the 12/14/04 broadcast
6     took the balance down to zero?
7  A. That would --
8         MR. CAMPBELL: Same objections as before.
9  A. That would have -- no, that would have said there was
10     a balance of $85.15 still in their account as of
11     12/14/04.
12 Q. (BY MR. KELLY): How was the $85.15 used?
13        MR. CAMPBELL: Objection.
14 A. Do you mean the balance that was left?
15 Q. (BY MR. KELLY): Yes.
16 A. Well, under our terms and conditions, if you do not
17    use your account for three months after your last
18    facsimile sending, you are charged a maintenance fee
19    of $25.00 per month. In this particular case, there
20    was no activity for the whole year of 2005, so I would
21    guess that somewhere in April or May of 2005 their
22    balance zeroed out.
23 Q. Does Mail2Media sell fax lists?
24 A. Mail2Media doesn't sell them directly. A sister
25    company, Data Discounts, sells databases to clients.

Page 35

1  Q. Has Mail2Media or Data Discounts ever sold any fax
2     lists to Express Products?
3  A. My recollection, yes.
4         MR. CAMPBELL: I'm just going to object to Rule
5     213.
6  Q. (BY MR. KELLY): Are you able to determine when the
7     fax list was purchased?
8  A. No, I don't recall when.
9         MR. CAMPBELL: And I'll assert a foundation.
10 Q. (BY MR. KELLY): Where is Data Discounts located?
11 A. Data Discounts has gone out of business as of August
12    of 2006, so they were located in our same building at
13    4926 Delemere Avenue, Royal Oak.
14 Q. Who is responsible for obtaining the company
15    information and fax lists at Data Discounts?
16        MR. CAMPBELL: Objection, Rule 213 and
17    foundation.
18 A. I don't understand your question.
19 Q. (BY MR. KELLY): Who owned the company, Data
20    Discounts?
21 A. I owned Data Discounts.
22 Q. How did Data Discounts obtain company information and
23    the fax numbers?
24        MR. CAMPBELL: Same objections.
25 A. Data Discounts, for a number of years, we would send

Page 36

1     messages out to clients asking them to give us their
2     name, address, city, state, zip code, phone number,
3     fax number, e-mail address if it applied, to be added
4     into a database. They may have gone to a website, our
5     website to add that information in also.
6  Q. (BY MR. KELLY): Did Data Discounts have a website
7     address?
8  A. It was datadiscounts.com.
9  Q. Why did the company go out of business?
10        MR. CAMPBELL: Let me just share Rule 213
11    objections to anything dealing with Data Discounts.
12 A. Data Discounts was not a functional company, a
13    profitable company, and I decided to close it.
14 Q. (BY MR. KELLY): Was the list that was sold to Express
15    Products a list in which companies had first given
16    permission to receive advertisements by fax?
17 A. Honestly, I don't know because I don't know what list
18    they acquired.
19 Q. Are you able to determine what list you gave Express
20    Products?
21        MR. CAMPBELL: Let me just show objections to
22    foundation and leading, Rule 213.
23 A. Again, I don't recall what list that they -- I mean,
24    you probably have it there, but I don't have it here.
25    I don't recall. I know there was a -- I believe there

Page 37

1     was a list that was provided to them based on their
2     specifications, but I don't know what list that was
3     off the top of my head.
4  Q. (BY MR. KELLY): Do you have a recollection as to what
5     specification Express Products gave you?
6         MR. CAMPBELL: Same objections and foundation.
7  A. Honestly, no. It would only -- I would only be
8     guessing if I answered that.
9  Q. (BY MR. KELLY): How was the fax list given to Express
10    Products, through e-mail, CD-ROM?
11 A. Normally we would --
12        MR. CAMPBELL: Same objections.
13 A. We would normally provide it by e-mail or by CD,
14    whatever the client requested.
15 Q. (BY MR. KELLY): If the client requested the fax list
16    to be given to them by CD-ROM, would you keep a copy
17    of what was sold?
18        MR. CAMPBELL: Same objection. Do you want me to
19    just show a continuing objection to all of this?
20        MR. KELLY: Yes.
21        MR. CAMPBELL: Okay.
22 A. No.
23 Q. (BY MR. KELLY): Is there any way --
24        MR. CAMPBELL: And just so we're clear, my
25    continuing objection would be relevance, Rule 213, and

## Page 38

1 foundation and speculation.
2 Q. (BY MR. KELLY): When responding to the subpoena, did
3 you review e-mails to and from Express Products?
4 A. I reviewed whatever we had in our files that pertained
5 to the subpoena.
6 Q. Are you able to determine the list that was sold to
7 Express Products if you went back to the office?
8 A. Honestly, I think that you would probably -- through
9 an e-mail, I believe, that you may have.
10 Q. Right.
11 A. It would show me what list that was.
12 Q. Okay.
13 A. I believe, my recollection from last time.
14 Q. I'm showing you what's been marked as Plaintiff's
15 Exhibit 5, and ask you to take a look at that. Based
16 upon your review of Plaintiff's Exhibit 5, are you
17 able to determine which fax list was purchased by
18 Express Products?
19 A. On Page 1, no.
20    On Page 2 it shows me that there was a list of
21 22,000, and after our fax removals it dropped down to
22 17,000. And then once it was consolidated, it dropped
23 down to 13,111.
24    I just don't -- on Page 3, just a re-cap, it
25 doesn't really show me, tell me, what this list was.

## Page 39

1 It was a file of 22,000, a master file originally of
2 22,000, but it doesn't say to me what that list was
3 from this documentation.
4 Q. Do you see that there's black markings on Plaintiff's
5 Exhibit 5?
6 A. Yes.
7 Q. Did you make those --
8    MR. CAMPBELL: Let me just object and move to
9 strike this testimony. In his deposition --
10    MR. KELLY: Hold on. Kevin, I'm not going to let
11 you read from his deposition at direct examination.
12    MR. CAMPBELL: No. I'm making my objection for
13 the record under Rule 213.
14    MR. KELLY: All right. You can make an
15 objection, but it's not going to be a speaking
16 objection, and I'm not going to let you read from the
17 deposition.
18    MR. CAMPBELL: This is an evidence deposition, so
19 I have to give my foundation which includes the basis
20 for my objections.
21    MR. KELLY: You can make that argument in front
22 of the judge when we argue the objections, but I'm not
23 going to let you do that in front of the witness.
24    MR. CAMPBELL: I'm going to do what I feel is
25 appropriate, and at Page 45 in his deposition he

## Page 40

1 testified that the list in Exhibit 5 were not
2 purchased by Express Products.
3    MR. KELLY: Well, I think you've crossed the line
4 and you've tainted the witness by giving testimony
5 from his deposition, and I would strongly encourage
6 you not to do it again, and I'll seek sanctions for
7 you doing that.
8    MR. CAMPBELL: But, the basis of my objection is
9 you have asked him questions in violation of Rule 213
10 --
11    MR. KELLY: Counsel, I don't want a narrative.
12 You'll have a chance to cross-examine the witness
13 after I'm done. You can argue what you need to argue
14 in front of the judge, but it's not going to be done
15 here in this room.
16    MR. CAMPBELL: I will do whatever I feel is
17 appropriate to protect the interests of my client.
18    For the record, I'm objecting to all the
19 questions that you've asked regarding -- what is it,
20 Plaintiff's Exhibit 5, with respect to Rule 213 and
21 with respect to the fact that in his prior deposition
22 testimony he testified that those documents and lists
23 that are included in Plaintiff's Exhibit No. 5 were
24 not purchased.
25 Q. (BY MR. KELLY): The company information and fax

## Page 41

1 numbers that Data Discounts obtained, is that
2 information that constantly involved -- or how was
3 that list obtained?
4 A. I don't --
5    MR. CAMPBELL: And just the same continuing
6 objections with respect to Data Discounts.
7 A. Can you repeat your question?
8 Q. (BY MR. KELLY): Yes. Does Data Discounts still have
9 the database that was used to sell to various
10 companies?
11 A. No. When the company was closed, that data was
12 destroyed.
13 Q. Did anybody at Data Discounts ever personally contact
14 anybody on the list seeking permission for
15 advertisements by fax to be sent by Express Products?
16 A. No.
17    MR. CAMPBELL: I'm sorry. Could you read that
18 question back?
19    COURT REPORTER: Did anybody at Data Discounts
20 ever personally contact anybody on the list seeking
21 permission for advertisements by fax to be sent by
22 Express Products?
23    MR. CAMPBELL: The same objections as before.
24 Q. (BY MR. KELLY): Are you able to determine by
25 reviewing Plaintiff's Exhibit 5 the number of

Page 42

1  companies and fax numbers that were sold to Express
2  Products?
3      MR. CAMPBELL: Same objections.
4      MR. KELLY: And you'll have a continuing
5  objection.
6  A. The master file had 22,190 in it, that was the master
7  file, but after cleaning and removals and so-forth, it
8  looks like the list had 13,111.
9  Q. (BY MR. KELLY): What do you mean by _cleaning_?
10 A. We would take a -- or we maintained a nationwide do
11 not fax list that clients can go to our website and
12 add their fax number so they don't receive a fax
13 message from us. Clients could put their number in
14 there as one avenue. Clients call our toll-free
15 number and ask to be removed from any future fax
16 messages, and we add that to the do not fax list.
17 There are duplicates. So, when I say cleaning,
18 duplicates can be removed, do not fax numbers can be
19 removed, just the cleaning of the list to get it to be
20 accurate.
21 Q. Did you have any discussions with Dan Geiger regarding
22 the purchase of the fax list?
23 A. I don't remember a conversation directly; however, I
24 don't know. One of the difficulties I have today is
25 to recall my deposition. I don't have the luxury of

Page 43

1  what you both have, is the transcript of that
2  deposition.
3  Q. Sure.
4  A. I can only base my recollection of what I said at that
5  time.
6  Q. Let me show you what's been marked as Plaintiff's
7  Exhibit 5 -- I'm sorry, Plaintiff's Exhibit 10 and ask
8  you to take a look at this. Does this document appear
9  to be a --
10     MR. CAMPBELL: Can we go off the record for a
11 minute?
12     MR. KELLY: Let's go off the record.
13     VIDEOGRAPHER: We are going off the record, the
14 time is 3:08 and 8 seconds p.m.
15     (Short break)
16     VIDEOGRAPHER: We are back on the record, the
17 time is 3:08 and 43 seconds p.m.
18 Q. (BY MR. KELLY): Does Plaintiff's Exhibit 10 appear to
19 be an invoice from Mail2Media to Express Products?
20 A. Yes.
21 Q. Are you able to determine what was sold to Express
22 Products?
23 A. It looks like a list of cellular manufacturers or
24 wholesalers.
25 Q. Okay. What is a cellular manufacturer or wholesaler?

Page 44

1  A. It would be someone -- a company that would purchase
2  cellular products for resale to the public.
3  Q. How is it that Data Discounts could obtain that type
4  of information to be sold?
5  A. Every company has a S.I.C. code. A S.I.C. code is
6  represented by the industry that a company is in. So,
7  if you are a cellular wholesaler you have a unique
8  S.I.C. code for us to select, to collate and grab that
9  group of companies.
10 Q. And the S.I.C. code is something that's assigned by
11 the U.S. Government?
12 A. Yes. It's a standard -- every business has a S.I.C.
13 code.
14 Q. S.I.C. code, does that stand for Standard Industry
15 Code?
16 A. Yes, Standard Industry Code.
17 Q. In order for Data Discounts to obtain company
18 information for a particular S.I.C. code, did Data
19 Discounts purchase S.I.C. codes from different third
20 parties?
21     MR. CAMPBELL: Just to be clear, we have the same
22 continuing objections to Exhibit 10.
23 A. You don't purchase an S.I.C. code. An S.I.C. code is
24 something given by the government to everyone. If you
25 purchase lists from other companies, you can purchase

Page 45

1  them by S.I.C. code.
2  Q. (BY MR. KELLY): Did Data Discounts purchase lists by
3  S.I.C. code?
4      MR. CAMPBELL: Objection, leading.
5  A. We would purchase lists by S.I.C. code as one
6  demographic, there could be others.
7  Q. (BY MR. KELLY): Okay. Where did Data Discounts
8  purchase lists from?
9  A. It could have been a lot of different sources. I'll
10 name one or two that I know of. One could be a Dunn
11 and Bradstreet, one could be companies like Accudata,
12 these are companies that sell lists that maintain
13 databases. Equifax is another that you can buy; and
14 purchase data from the states, individual states. So,
15 you would -- they're maintaining data and updating
16 data and selling data.
17 Q. Does Dunn and Bradstreet sort their lists by S.I.C.
18 codes?
19 A. One of the many selections, yes.
20 Q. Does Equifax sort by S.I.C. code?
21 A. Equifax is more of database records, so I'm not sure
22 if they have the S.I.C. code in it.
23 Q. So, in order for Data Discounts to sort by S.I.C.
24 code, they first need to purchase a list from a third
25 party that has already done that, correct?

Page 46

1  A. Yes, or they have it -- we had it in our database.
2  Q. Did you have the S.I.C. codes for cellular retailers
3     and manufacturers in your database?
4  A. Our database records had complete -- as much of the
5     information as we could possible have, meaning it
6     could be a name, address, city, state, zip code, phone
7     number, telephone number, fax number, website, S.I.C.
8     code, industry, credit rating. We had as much record
9     data as we had.
10 Q. Plaintiff's Exhibit 10 indicates that Express Products
11    was charged $609.50 for these fax numbers, is that
12    right?
13 A. That is correct.
14 Q. If you take a look at Plaintiff's Exhibit 5, is that
15    consistent with Plaintiff's Exhibit 5?
16 A. It is the final selling price of $609.50 as is
17    outlined on Page 3.
18 Q. Is Plaintiff's Exhibit No. 5 true and accurate e-mails
19    going to and from Express Products, is that true?
20    MR. CAMPBELL: I'll just object to foundation.
21 A. Again, from the header on the pages, yes.
22 Q. (BY MR. KELLY): Are you able to determine how many
23    S.I.C. codes were purchased by Express Products?
24 A. Based on the invoice that I've seen, I would say
25    probably one, being the cellular wholesaler or

Page 47

1     distributor. But, again, it's recollection.
2  Q. How would I obtain the list -- strike that.
3        Do you currently have access to the company names
4     and fax numbers of the S.I.C. code identified by a
5     cellular wholesaler or distributor?
6  A. I don't understand your question.
7  Q. Okay. You sold a fax list to Express Products with
8     one S.I.C. code, which is a cellular wholesaler or
9     distributor. How would I obtain that company
10    information?
11 A. An S.I.C. number?
12 Q. Yes.
13 A. You would go to any government website where S.I.C.'s
14    are listed, and they have it alphabetically and you
15    would search through all the S.I.C. codes to find that
16    appropriate number starting the four positions of that
17    S.I.C. code.
18 Q. Did you ever purchase any list from Info U.S.A.?
19 A. I believe --
20    MR. CAMPBELL: Let me just object on Rule 213.
21 A. I believe we probably have, they're one of the largest
22    list houses in the country.
23 Q. (BY MR. KELLY): Does Info U.S.A. sort company
24    information by S.I.C. codes?
25 A. It's one of the selections that you can make.

Page 48

1     MR. CAMPBELL: Let me just have standing
2     objections to Rule 213 and foundation with respect
3     Info U.S.A. questions.
4  Q. (BY MR. KELLY): The 13,111 number, what does that
5     number entail?
6  A. The final list count.
7  Q. What are interest for Data Discounts?
8  A. I'm sorry?
9  Q. The third page on Plaintiff's Exhibit 5 says, _we
10    removed $50.00 for interest for Data Discounts,_ what
11    is that?
12    MR. CAMPBELL: Just object on relevance.
13 A. I really don't know what that is.
14 Q. (BY MR. KELLY): Now, the third page on Plaintiff's
15    Exhibit 5, it's signed by Michael Douglas, is that
16    right?
17 A. You mean the second page?
18 Q. I'm sorry, the second page, it's signed by Michael
19    Douglas, is that right?
20 A. Yes.
21 Q. Who is Michael Douglas?
22 A. I'm Michael Douglas.
23 Q. And why do you use Michael Douglas?
24 A. That is my sales name because we are not a big company
25    and I use that name to sell, and to not be confused

Page 49

1     with Robert Demyanovich, who is the owner.
2  Q. Okay. And who is Diane Troise?
3  A. Diane Troise is my wife, and that's her married name.
4  Q. Do you currently have a copy of the second -- of any
5     of these documents at Mail2Media?
6  A. I would say probably not if we didn't provide them for
7     you in our original request. But, they would not go
8     into the file of the client.
9     VIDEOGRAPHER: We are going off the record, the
10    time is 3:19 and 23 seconds p.m.
11    (Short break)
12    VIDEOGRAPHER: We are back on the record, this is
13    the beginning of Tape 2, the time is 3:28 and 39
14    seconds p.m.
15 Q. (BY MR. KELLY): Have you ever personally spoken with
16    anybody at Business Pro Communications?
17 A. No, not to my recollection.
18 Q. Have you ever personally spoken to anybody at Direct
19    Communications?
20 A. No.
21 Q. To your knowledge, has anybody at Mail2Media ever
22    spoken to anybody at either Business Pro
23    Communications or Direct Communications?
24 A. Not to my knowledge.
25 Q. To your knowledge, has anybody at Data Discounts ever

Page 50

1 spoken to anybody at Business Pro Communications or
2 Direct Communications?
3 A. Not that I'm aware of.
4 Q. Did Business Pro ever give anybody at Data Discounts
5 permission to receive advertisements by fax?
6 A. I don't know.
7 Q. Do you have any documents showing that Business Pro
8 ever gave permission to Data Discounts for it to send
9 faxes?
10 A. I don't know.
11 Q. Did anybody at Data Discounts ever call Business Pro
12 Communications?
13 A. I don't know.
14 Q. Did anybody at Data Discounts ever call companies to
15 obtain fax numbers in order for advertisements to be
16 sent out by fax?
17 A. Yes.
18 Q. As you sit here today, you have no knowledge as to
19 whether anybody at Data Discounts ever spoke to
20 anybody at Business Pro or Direct Communications,
21 correct?
22 A. Again, I don't know.
23 Q. Is there any way to determine whether or not Business
24 Pro Communications or Direct Communications was on the
25 list that was purchased to Express Products?

Page 51

1     MR. CAMPBELL: Same objection as before.
2 A. And I don't have that list in front of me.
3 Q. (BY MR. KELLY): Okay. Are you able to obtain that
4 list?
5 A. I don't know. I mean, the list -- whatever data we
6 gave, we gave to on a C.D., so, no.
7 Q. Did Express Products ever hire Data Discounts to call
8 on their behalf to seek permission from those
9 companies in order to send advertisements by fax?
10 A. No.
11 Q. Would you agree with me that the list that was sold to
12 Express Products does not necessarily mean that those
13 companies are customers of Express Products?
14     MR. CAMPBELL: Same objection, foundation and
15 speculation, leading.
16 A. I don't know.
17 Q. (BY MR. KELLY): Do you have any records showing that
18 anybody from Data Discounts ever called anybody on the
19 list that was sold to Express Products seeking
20 permission to send advertisements by fax?
21     MR. CAMPBELL: Same objections, and leading.
22 A. I don't know.
23 Q. (BY MR. KELLY): Did Mr. Dan Geiger ever ask you about
24 how the list was generated?
25 A. Not to my recollection.

Page 52

1 Q. Did you ever tell Mr. Geiger that the companies on the
2 list had first given permission for advertisements to
3 be sent by fax?
4     MR. CAMPBELL: Let me just object. When you say
5 the _list_?
6 Q. (BY MR. KELLY): The list purchased by Express
7 Products?
8     MR. CAMPBELL: Same objections as before.
9 A. I don't believe so.
10 Q. (BY MR. KELLY): Did you ever tell Mr. Dan Geiger that
11 employees at Data Discounts had first called the
12 companies on the list seeking permission to send
13 advertisements by fax?
14 A. No.
15 Q. I'm showing you what's been marked as Plaintiff's
16 Exhibit 2. Is this the CD-ROM that was produced by
17 Mail2Media in response to the subpoena?
18 A. Yes, it is.
19 Q. Okay. Do you recognize the face of the CD-ROM?
20 A. Yes, I do.
21 Q. What does it say and what does the handwriting section
22 say?
23 A. It says _History of Account 2157030890, 213 Files from
24 02/2002 to 10/2004_.
25 Q. Whose writing is that?

Page 53

1 A. That is my handwriting.
2 Q. Okay. Account 2157030890, that's the same number that
3 appears on invoices that are marked as Plaintiff's
4 Exhibit 1?
5 A. Yes.
6 Q. You wrote _213 files,_ do you see that?
7 A. Yes.
8 Q. Did you have to count those files?
9 A. No. The computer would probably have given me a
10 summary.
11 Q. Okay. And the summary of the start and finish date of
12 the broadcasts, that was given to you by the computer?
13 A. The computer would have dated the first file and the
14 last file.
15 Q. What did you do -- strike that.
16     Did you personally obtain the data and put it on
17 the CD-ROM?
18 A. I didn't personally.
19 Q. Okay.
20 A. One of my operators would have taken all the files
21 that were there in the history of that account and
22 copied them onto a CD-ROM.
23 Q. What instructions did you give the operator in order
24 to produce this CD-ROM?
25 A. My recollection, to take the complete history of this

### Page 54

1  account number and copy it to a CD-ROM.
2  Q. And after the operator did that, did she then give you
3      the CD-ROM?
4  A. Yes.
5  Q. Can you put the CD-ROM into the laptop?
6      MR. CAMPBELL: For the record, I'm just going to
7      object to the use of Exhibit 2 to the extent that it
8      may contain transmissions other than the three are the
9      subject of the lawsuit.
10     MR. KELLY: Okay. You'll have a standing
11     objection to that.
12 Q. (BY MR. KELLY): Can you go to -- are you loading the
13     CD-ROM?
14 A. I'm bringing up the CD-ROM, that's what I'm doing.
15 Q. Can you explain to me what this field is?
16     MR. CAMPBELL: I'll just object to this being
17     displayed in front of the jury with respect to files
18     or folders or transmissions that are not the subject
19     of the three that are at issue in the lawsuit.
20     MR. KELLY: And you'll have a standing objection
21     to that, as well.
22 Q. (BY MR. KELLY): Can you describe what this screen
23     shot shows?
24 A. This shows you the particular projects, the date, the
25     time of each particular project on the left-hand side.

### Page 55

1      On the right-hand side was the day that we actually
2      copied them to the CD-ROM.
3  Q. Can you open up one of the folders; do you recognize
4      that?
5  A. Yes. That is the message, the success logs, the
6      failure logs, and the configuration file for a
7      particular job.
8  Q. How does Mail2Media obtain the data in order for it to
9      be put on the CD-ROM, how is that done?
10 A. This particular file or any of these files on here are
11     particular jobs that were processed for this client.
12     Our system is proprietary so it creates, after
13     completing each project, it will create a success log,
14     a broadcast log, which represents failures, a doc
15     page, which represents the message that was sent out,
16     and the config.data represents the history, meaning
17     the date, the time, how many pages a message -- it's
18     more of a management sheet.
19 Q. How long is the data stored on your program?
20 A. We try to store the data for the life of the account.
21     This data was written on, I believe, March of last
22     year, so it will stay for at least seven years, five
23     to seven years.
24 Q. And is it accurate to state that the data that is on
25     the CD-ROM is all of the data that's identified for

### Page 56

1      Express Products?
2  A. Yes, that is correct.
3  Q. You understand that the first transmission to be
4      somewhere in February of 2002?
5      MR. CAMPBELL: Again, I --
6      MR. KELLY: I can ask a different question.
7      MR. CAMPBELL: Are you withdrawing that question?
8      MR. KELLY: I'll withdraw the question.
9  Q. (BY MR. KELLY): Are you able to determine when the
10     first transmission date for Express Products was?
11     MR. CAMPBELL: I have a continuing objection to
12     any questioning other than the three faxes that are at
13     issue.
14     MR. KELLY: Okay.
15 A. Looking through the data, I see 2002 data, 5/15, so I
16     would say it's not sorting it easily for me.
17 Q. (BY MR. KELLY): Okay.
18     MR. KELLY: Do you want to go off the record so
19     we have a correct answer? I mean, they don't sort by
20     date.
21     MR. CAMPBELL: Okay.
22     MR. KELLY: Let's go off the record.
23     VIDEOGRAPHER: We are going off the record, the
24     time is 3:42 and 19 seconds p.m.
25        (Short break)

### Page 57

1      VIDEOGRAPHER: We are back on the record, the
2      time is 3:44 and 25 seconds p.m.
3  Q. (BY MR. KELLY): Are you able to determine, upon your
4      review of the CD-ROM, when the first broadcast
5      occurred for Express Products?
6  A. I believe in February, 2002.
7  Q. Do you have the date?
8  A. February 27, 2002.
9  Q. Are you able to determine when the last broadcast
10     occurred for Express Products?
11 A. Based on these logs, October 25th, 2004.
12 Q. Thank you. I see on the screen that a date has more
13     than one file folder, why is that?
14 A. If it's broken onto different computer systems, it can
15     be broken, for speed, to get the message delivered
16     faster. It's broken into different computer systems.
17 Q. Okay. If we take a look at February 27, 2002, the
18     first broadcast -- open that up -- the first file name
19     is _broadcast.log,_ do you see that?
20 A. Yes, I do.
21 Q. Can you open that up?
22     MR. CAMPBELL: Same objections as before.
23 Q. (BY MR. KELLY): What is the _broadcast.log_?
24 A. That is your failure logs, faxes that did not get
25     delivered.

| Page 58 | Page 60 |
|---|---|
| 1 Q. Okay. Are you able to determine by looking at the<br>2    broadcast log why the fax did not go through?<br>3 A. In the right-hand column, the last column, will show a<br>4    reason. It could be busy, it could be that it's not a<br>5    valid number.<br>6 Q. Okay. And then the _zero,_ what does the zero refer<br>7    to?<br>8 A. Number of seconds represents no seconds.<br>9 Q. Okay. Can you close out of that screen, and can you<br>10    click on _config.dat_?<br>11      MR. CAMPBELL: Same objections.<br>12 Q. (BY MR. KELLY): Are you familiar with this<br>13    config.dat?<br>14 A. Yes, I am.<br>15 Q. Okay. What does _send time_ mean?<br>16 A. That is a Julian date, a Julian date is a eunicks<br>17    (phonetic) date that constantly changes.<br>18 Q. What's the purpose of a Julian date?<br>19 A. When you're dealing in computer language, you can't<br>20    just use the date 02/27/02, you have to -- the<br>21    computer picks a eunicks number to -- which basically<br>22    represents that date and time that a project was<br>23    started.<br>24 Q. What does _stop time_ mean?<br>25 A. It represents just a code, an internal code. It | 1 Q. Can you close out of this, please?<br>2      Can you go to _doc pages T.I.F.?<br>3      MR. CAMPBELL: Same objections.<br>4 Q. (BY MR. KELLY): What does this file represent?<br>5 A. This is the message that was sent out by us for<br>6    Express Products on that particular day.<br>7 Q. So, those files that say _doc pages,_ that's the fax<br>8    or the message that was sent to broadcast?<br>9 A. That was the approved message.<br>10      MR. CAMPBELL: Objection, leading.<br>11 Q. (BY MR. KELLY): How is Mail2Media able to determine<br>12    that that message went with the particular broadcast?<br>13 A. There is a job number that's pertaining to each job,<br>14    and that message was assigned by the computer as the<br>15    job number.<br>16 Q. Okay. Can you close out of there, please?<br>17      Can you go to _success log_?<br>18      MR. CAMPBELL: Same objections.<br>19 Q. (BY MR. KELLY): What does the _success log_ indicate?<br>20 A. It represents the name, the company, and the fax<br>21    number, date and time and the length of successful fax<br>22    messages.<br>23 Q. Okay. The length is the last column, is that right?<br>24 A. The last column represents the number of seconds that<br>25    message took. |
| Page 59 | Page 61 |
| 1    doesn't mean anything here.<br>2 Q. What is _group names_?<br>3 A. It shows you the name of the file that was sent out,<br>4    who the client was, in this case Express Products.<br>5    That number, that 10-digit number, is a job number and<br>6    a date of when the job was submitted into the system.<br>7 Q. What does _page number_ mean?<br>8 A. It represents that there was only one page to the<br>9    message?<br>10 Q. What does _image type_ mean?<br>11 A. Image type means the type of message, it's a T.I.F.<br>12    file.<br>13 Q. Does the number 16 always mean a T.I.F. file?<br>14 A. Normally it does, it can change, though.<br>15 Q. What is a T.I.F. file?<br>16 A. A T.I.F. file is a graphic file the computer<br>17    understands, a black and white graphic file used for<br>18    faxing.<br>19 Q. What does _cover page_ mean?<br>20 A. If there was a cover page along with the message, it<br>21    would represent a 1 there, meaning it would be a two-<br>22    page message.<br>23 Q. What does _compression_ mean?<br>24 A. Compression is just a type -- internal compression of<br>25    the file itself. | 1 Q. And the column just to the left of that is the time it<br>2    was sent?<br>3 A. Yes, the time it was delivered.<br>4 Q. Okay. And then to the left of that is the date it was<br>5    delivered?<br>6 A. That is correct.<br>7 Q. To the left of that is to the fax number it was<br>8    delivered?<br>9 A. That's correct.<br>10 Q. And then to the left of that would be the _to_<br>11    designation?<br>12 A. Yes. The company name and contact name.<br>13 Q. And then the first column would be the _from_<br>14    designation?<br>15 A. No. The first column would be the _to, name,_ the<br>16    name of a person; and then the next field would be the<br>17    name of a company.<br>18 Q. Does Mail2Media designate the _from_ field?<br>19 A. The _from_ is automatically designated based on their<br>20    file when they created a file with us.<br>21 Q. The way the data is displayed here, is that in comma<br>22    separated variables?<br>23 A. Yes, it is, comma delimited.<br>24 Q. Okay. And this data was generated automatically<br>25    through your program, is that right? |

Page 62

1  A. Through our proprietary system, yes.
2  Q. Do the success log files that are on this CD-ROM truly
3     and accurately depict the companies that actually
4     received the faxes?
5  A. Yes, they do.
6  Q. Okay. Can you close out of there -- I'm sorry -- is
7     there a way that you can add up how many successful
8     transmissions are on a particular folder?
9  A. A client who would view these logs would be on our
10    website, and that's part of the program, they'd be
11    able to see how many succeeded, how many failed and
12    the average seconds.
13 Q. Okay. In no pattern is there a way to add up -- so,
14    one would just need to add up the different lines?
15 A. You would open that file and it would say _Excel_.
16 Q. Excel, okay.
17 A. And then Excel would tell you.
18 Q. Can you do that?
19 A. Sure.
20 Q. Okay.
21      MR. CAMPBELL: Same objections.
22 Q. (BY MR. KELLY): And you can pick February 27, 2007
23    again. The pound marks on _field D,_ if you can
24    expand those columns.
25 A. Okay.

Page 63

1       MR. CAMPBELL: Same objections as before.
2  A. 2,257.
3  Q. (BY MR. KELLY): Okay. And you can do that type of
4     search for all of the success log files, correct?
5  A. Yes.
6  Q. Okay. And you can also do it for the broadcast logs,
7     too?
8  A. The failures, yes.
9  Q. Does each line indicate one successful transmission?
10 A. Yes.
11 Q. And is it also accurate that the particular message
12    that was sent to all of the companies -- is the T.I.F.
13    file associated with that particular broadcast?
14 A. Yes.
15 Q. Okay. Can we close out of there?
16       Are you able to determine whether or not the file
17    data has been modified recently?
18 A. The data is the data, the computer date doesn't
19    change. You cannot modify that data unless you put it
20    on another computer and open it and save it and re-
21    write it.
22 Q. Okay. So, the data on Exhibit 2 cannot be altered,
23    modified, or changed in any way, correct?
24 A. That's why it shows the -- the answer is no, unless
25    you -- you would see a new date. And, as you saw when

Page 64

1     we copied it to the CD, it showed the date we did it.
2  So, the computer stamps a date, time, timestamp on any
3  files you are writing to your computer.
4  Q. Let me show you what's been marked as --
5       MR. KELLY: Do you need copies, Kevin?
6       MR. CAMPBELL: Let me just make sure.
7  Q. (BY MR. KELLY): I'm showing you what's been marked as
8     Plaintiff's Exhibits 3, 4 and 6 dated January 30th,
9     2007.
10      I want to draw your attention to Exhibit 4, it
11    says _from_ and then it says _T.M.A.,_ do you see
12    that?
13 A. Yes, I do.
14 Q. That's an error on Mail2Media's part?
15 A. That's an error on an operator's part.
16 Q. Okay. But, it's still an Express Products authorized
17    transmission?
18 A. Yes.
19 Q. Okay. I want you to search on the computer for these
20    particular advertisements, for Exhibit 3, can you take
21    a look at the July 26, 2004 transmission, and then it
22    would be 11, 8, 14. Can you click on to see what
23    particular fax was sent? Is what appears on the
24    screen identical to Exhibit 6?
25 A. Exhibit 6, yes.

Page 65

1  Q. Okay. Can you close out of there?
2       Can you look in the success log, and can you
3     search by a fax number, 847-855-2667? Does the fax
4     number of 847-855-2667 appear on the success log?
5  A. Yes, it does.
6  Q. And when was that particular advertisement sent?
7  A. July 20th, 2004.
8  Q. It was sent to Shawn at --
9  A. Business Pro Communications.
10 Q. Okay. Can you exit out of there, please?
11      Can you go to July 26, 2004?
12 A. I'm sorry, what date?
13 Q. July 26, 2004.
14 A. Okay.
15 Q. And then it -- would 13, 50, 07, go to the
16    advertisement first. Does Exhibit 3 appear to be the
17    Exhibit that's displayed on the screen?
18 A. Yes.
19 Q. Okay. Can you close out of there, please?
20      Can you look in the success log, and can you
21    search by a fax number, 847-855-2667? Does it appear
22    that Exhibit 3 was sent to Shawn at Business Pro at
23    fax number 847-855-2667 on July 26, 2004?
24 A. Yes.
25 Q. Can you close out of there?

Page 66

1  Can you open up August 9, 2004, 14, 50, 25 and
2  look at the advertisement. Does Exhibit 4 appear to
3  be the ad that's displayed on the laptop?
4  A. Yes.
5  Q. Can you close out of there?
6      Can you look in the success log, and can you
7  search by fax number, 847-855-2667?
8      Does it appear that that particular ad was sent
9  to Shawn at Business Pro at 847-855-2667 on August 9,
10 2004?
11 A. Yes.
12 Q. The data that's identified in Exhibit 2, that's a
13 business record of Mail2Media?
14 A. That is a record what was used to do a facsimile
15 broadcast.
16 Q. And the data is automatically generated at or near the
17 time of the transmissions?
18 A. Yes.
19 Q. Okay. The data hasn't been altered, modified, or
20 changed in any way, correct?
21 A. No.
22 Q. The CD that was in the laptop, that's the CD that was
23 produced to my office in response to this litigation,
24 correct?
25 A. Yes.

Page 67

1  Q. And it contains all of the transmission logs for
2  Express Products, correct?
3  A. Yes.
4  Q. Okay.
5      MR. KELLY: Those are all the questions that I
6  have.
7      Do you want to work off the laptop or ask him
8  questions?
9      MR. CAMPBELL: I'll just ask him questions. It
10 will probably be easier if you want to turn this off
11 and just go back to sitting.
12 EXAMINATION BY MR. CAMPBELL:
13 Q. Mr. Demyanovich, with respect to the success files
14 that were contained in Deposition Exhibit No. 2, can
15 those contain false/positives?
16 A. I don't know what you mean by that.
17 Q. Well, the fact that it's shown as a success, does that
18 mean that there was initially a connection, but does
19 it necessarily mean that a fax actually went through?
20 A. Computer technology, when it starts to send a fax, the
21 computer looks for a tone from that fax machine to
22 start your fax message. When it ends sending that
23 message to a machine, it also listens for another tone
24 to say that it has received that fax message. So, the
25 computer technology looks for tones, so if it received

Page 68

1  the tone, then it would say it's successful and it
2  means that that message got to that fax machine.
3  Q. So, if the call was interrupted, would that be
4  reflected?
5  A. As a failure, as a broadcast.
6  Q. With respect to the logs that show successful
7  transmissions, does that necessarily mean that a fax
8  was actually printed at the other end?
9  A. No.
10 Q. With respect to Plaintiff's Exhibits 3, 4 and 6,
11 you've identified those Exhibits as being faxes that
12 were broadcast by Mail2Media at the request of Express
13 Products, correct?
14 A. Yes.
15 Q. And with respect to the headers at the top of the
16 Exhibits, where it says _to Shawn, Business Pro
17 Communications_ and then a phone number, is that
18 information provided to you by Express Products?
19 A. Yes.
20 Q. So, with respect to Plaintiff's Exhibits 3, 4 and 6,
21 Express Products provided you with a fax number that
22 they wanted this information sent to, correct?
23 A. Yes.
24 Q. They provided you with a business name that they
25 wanted the information sent to, correct?

Page 69

1  A. Yes.
2  Q. And they provided you with the name of a specific
3  individual at the company that they wanted the fax
4  directed to, correct?
5  A. Yes.
6      MR. CAMPBELL: That's all I have.
7      MR. KELLY: Those are all the questions?
8      MR. CAMPBELL: Yes.
9      MR. KELLY: Okay. I'll just make a couple of
10 follow-ups.
11 FURTHER EXAMINATION BY MR. KELLY:
12 Q. Do you have any knowledge as to Express Products'
13 policy in obtaining company information and fax
14 numbers?
15 A. No.
16 Q. Do you have any knowledge, as you sit here today,
17 whether Business Pro or any other company on these
18 success logs had first given permission to receive
19 advertisements by fax?
20     MR. CAMPBELL: I'll just object, outside the
21 scope.
22 A. No.
23 Q. (BY MR. KELLY): As you sit here today, do you have
24 any knowledge as to whether Business Pro or any other
25 companies on the success logs are customers of Express

Page 70

1 Products?
2   MR. CAMPBELL: Objection, outside the scope.
3 A. I don't know if they are.
4 Q. (BY MR. KELLY): You have no knowledge, correct?
5 A. I have no knowledge.
6 Q. Okay.
7   MR. KELLY: Do you want me to move the Exhibits
8 into evidence -- I mean, I'll move the Plaintiff's
9 Exhibits 1 to 5, and 10 into evidence.
10   (Deposition Exhibit Nos. 1, 2, 3, 5 and 10
11   marked for identification)
12   MR. CAMPBELL: Which one is No. 1?
13   MR. KELLY: No. 2 is the CD.
14   MR. CAMPBELL: Okay -- I mean, I'll object to
15 No. 2 for the reasons previously argued in the sense
16 that it contains information that's not relevant to
17 the litigation, and the same objections with respect
18 to 10 and 1 and 5.
19 Q. (BY MR. KELLY): Have you spoken to Mr. Dan Geiger
20 within the last year?
21   MR. CAMPBELL: Objection, outside the scope.
22 Q. (BY MR. KELLY): You can answer.
23 A. I believe prior to my deposition.
24 Q. Today or --
25 A. No, the one I did last year when I first received the

Page 71

1 subpoena.
2 Q. Since your prior deposition, have you spoken to him?
3   MR. CAMPBELL: Objection, outside the scope.
4 A. No.
5   MR. KELLY: Okay. Those are all the questions
6 that I have.
7   VIDEOGRAPHER: This concludes the deposition, the
8 time is 4:12 and 15 seconds p.m.
9   (Deposition concluded)

Page 72

1 STATE OF MICHIGAN   )
2 COUNTY OF OAKLAND )
3   I, William J. Rittinger (CSR-2176), a Notary
4 Public, do certify that pursuant to the Michigan Rules of
5 Court, there came before me on January 30, 2007, at 39520
6 Woodward Avenue, Bloomfield Hills, Michigan, ROBERT
7 DEMYANOVICH was sworn to testify as to his knowledge
8 touching and concerning the matters in controversy in this
9 case; that he was examined upon his oath and his
10 examination reduced to typewritten form; that the
11 deposition is a true record of the testimony given by the
12 witness. I further certify that I am neither attorney or
13 counsel for, nor related to or employed by, any of the
14 parties to the action in which this deposition is taken;
15 and, further, that I am not a relative or employee of any
16 attorney or counsel employed by the parties hereto or
17 financially interested in the action.
18   Date: _____, 2007
19
20 _____
21
22 William J. Rittinger, Notary Public
23 Oakland County, Michigan
24 My Commission expires: 2-26-2008
25